UNITED STATES of America,
Plaintiff/Appellee,

v.

John TOWNSEND,
Defendant/Appellant.

UNITED STATES of America,
Plaintiff/Appellee,

v.

Shiv MOHAN, Defendant/Appellant.

UNITED STATES of America,
Plaintiff/Appellee,

v.

David WHYTE, Defendant/Appellant.

Nos. 89–30228, 89–30229 and 89–30231.

United States Court of Appeals,
Ninth Circuit.

Submitted Aug. 30, 1989.

Decided March 1, 1990.

John W. Lundin, Seattle, Wash., and Phillip B. Abramowitz, Robshaw, Abramowitz & Tobia, Buffalo, N.Y., for defendant-appellant Mohan.

Katrina C. Pflaumer, Seattle, Wash., for defendant-appellant Townsend.

Richard C. Tallman, and C. James Frush, Schweppe, Krug & Tausend, Seattle, Wash., for defendant-appellant Whyte.

Portia R. Moore, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before FARRIS, REINHARDT, and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Shiv Mohan, an Indian national normally residing in New Delhi, India, John Townsend, a British national normally residing in Australia, and David Whyte, a Canadian national normally residing in Toronto, Canada, all now held in custody in the Western District of Washington, appeal from the denial of bail. We affirm the district court.

## FACTS

At the two bail hearings that have been held in this case, the government presented evidence tending to establish the following: In April 1987 the Defense Department received information from a confidential source that a distribution system was being set up to export high technology computers to the Soviet Union through India in violation of United States export law. Those involved were identified as Sidhartha Bose and his company, Perfect Technologies, Ltd., an English company, and Shiv Mohan and his company, Kohinoor–Impex Private, Ltd. (KIP), an Indian company located in New Delhi. Perfect Technologies was to provide financing and KIP was to get the computers to the Soviet Union.

In January 1989, and continuing thereafter, Perfect Technologies, Ltd., KIP and Glaskovmos, an agency in the Soviet Union, were involved in a joint venture, whose nominal purpose was to import personal computers into the Soviet Union. There was evidence that the computers purchased by the joint venture were not confined to personal computers.

In February 1989 the Department of Commerce received word of a suspicious export of computers to India. Special Agent Jerry Hobbs of the Department of Commerce was assigned to investigate the source of the shipment. As a result of this investigation Hobbs executed a search warrant on March 29, 1989 on C–Tac Computers, in Kirkland, Washington, a company headed by Robert Casperson. Hobbs discovered a number of documents relating to the export of computers in apparent violation of United States export law. Casperson began to cooperate with the government, agreeing to record telephone calls.

As a further result of his investigation, Hobbs came to the following conclusions:

In the fall of 1988, five Microvax II computers with an approximate value of $375,000 had been purchased by John Townsend and exported from the United States to Australia. These computers were then transshipped to Singapore for the benefit of a company owned by Mohan. When it proved impossible to get the computers from Singapore to India without a United States license, they were returned to the United States and then shipped by Townsend and Casperson to David Whyte of Computech, a company located in Toronto, Canada. Whyte then reshipped the equipment to Singapore for Mohan's benefit.

On March 3, 1989 Townsend purchased the super minicomputer known as the Dec Vax 8700 with an approximate value of $490,000. Townsend and Casperson disassembled the computer into parts so that it would not appear to be a main frame computer and shipped it to an apartment in Singapore. A Dec Vax 8700, when assembled, weighs 2,000 pounds and is three feet deep, six feet tall, and six to eight feet long; it is highly unlikely that it can be used in an apartment; according to Casperson, it was disassembled in order to disguise what it was. The order was for the benefit of Mohan or one of his companies.

On October 5, 1988 Mohan ordered 25 Techtronix work stations, a sophisticated type of computer terminal. The work stations were to be sent to Whyte in Toronto and then forwarded by him to Mohan in India. Townsend ordered an additional 25 of these stations to be sent to Mohan in the same way. The president of Computech was aware of the Techtronix transactions. To deceive Techtronix into thinking that the work stations would not leave the United States, Whyte told the manufacturer that the order that Computech had placed was to meet an order of a United States military agency.

In July 1989 Casperson suggested to Mohan, Whyte and Townsend that they meet in Buffalo to discuss a cover story to explain the $1.6 million C–Tac had received from Mohan or from Perfect Technologies for the purchase of computers in the period December 1988 to March 1989. On July 17, 1989 a complaint charging the defendants with violation of 50 U.S.C. Appendix § 2410(a) and § 2410(b)(1) was filed with a United States magistrate in Buffalo. On July 21, 1989 the defendants met in Buffalo and were arrested.

Execution of search warrants on the defendants' hotel rooms led to further documentation of the relation between Perfect Technologies and Mohan's Indian company. Whyte told the arresting officers that he expected to get a commission of $65,000 on the Techtronix transaction, although his normal compensation was $60,000 a year. Mohan told the arresting officers that one of the customers for the Techtronix work stations was a New Delhi company, Modai Rubber. When the United States Embassy in New Delhi questioned senior officials at Modai Rubber, they stated they did not know of any Techtronix work stations ordered from Mohan.

The computers and the computing equipment were all listed by the United States as "Military Critical Technology." Export of them without a license would have been in violation of United States export law and transshipment from one country to another country without a United States license would have been in violation of United States export law.

## PROCEEDINGS

Following the arrests, a hearing was held before a magistrate in Buffalo. Pretrial Services reported that Mohan stated that he was the owner of Kamalen Engineering Co. in New Delhi, that he earned $60,000 a year from that business and that his net worth was $500,000. The Pretrial Services report stated that Whyte was a life-long resident of Toronto; that he had been married three years and had an eight-month old daughter; that he was "currently self-employed," working for Computech on a commission basis; and that he had a house he owned jointly with his wife in which they had equity of U.S. $280,000. No information in the record indicates what information was provided as to Townsend. Draw-

ing on the second bail hearing it may be stated that he was a resident of Australia, divorced from his wife and paying alimony and living with an Australian woman. With the latter he had equity in a house worth U.S. $75,000. He was self-employed. Eighty percent of his work in the past year had been for Mohan.

The magistrate reached the conclusion that there was probable cause for the detention of all three defendants. He set bail for Mohan at $1 million, bail for Townsend at $500,000 and bail for Whyte at $200,000.

The magistrate's bail order was stayed and a de novo hearing was held before the district court for the Western District of Washington on August 1, 1989. At this hearing various documents were presented on behalf of Mohan. The Bank of Maharashtra, an enterprise of the Indian Government, certified that KIP had banked with it for seven years and that Mohan had been known to the Bank for 15 years; that he was a dynamic businessman engaged in local trade in oil engines, generators, videotapes, and computers; and that he held a respectable place in society. An Indian public accountant certified that as of July 4, 1989 he had made an examination of the records of KIP from April 1, 1986 to March 31, 1989 and that the records showed the export by the company in its own name of personal computers, terminals and other items of computer equipment. The same accountant on August 2, 1989 signed a certificate providing "key financial data" on KIP for the past six years. Another public accountant certified on August 2, 1989 that KIP had maintained proper records. D.S. Sastri, counsel to the Indian Embassy in Washington, testified at the hearing that he "did not know this man [Mohan] from Adam" but that on the basis of these certificates Mohan appeared to be a reputable Indian businessman.

Another live witness for Mohan was Bernard Lang. Lang identified himself as a person living at Lake Geneva, Switzerland, who owned property in both Switzerland and Belgium and was engaged in managing his family's real estate and other industrial developments. He stated that he had known Mohan for 20 years and had become a friend of his and his family; the Mohan children called him "uncle." When bail was set at $1 million, Mohan's son, Munish, a student at Columbia University, telephoned him and asked him for his help. In response Lang had contacted bankers in Switzerland, borrowed $1 million, and asked them to wire it to Mohan's lawyer in the United States. Lang had then come to the United States to testify in Mohan's behalf. Lang said that he was paying interest on the loan, but did not state the amount of interest. He also stated that he did not know the total assets of Mohan or whether Mohan could repay him if the bail were forfeited, but he was sure that Mohan would not let him down by failing to appear at the trial.

In favor of the defendants were these facts:

Mohan had been identified by business associates in New Delhi as a well-known and established businessman with a company, KIP, whose records showed it to be engaged in lawful business. Whyte had had a stable working relation with Computech for several years. Townsend had worked in recent times largely for Mohan. None of the defendants had a police record. None had a history of alcohol or drug abuse. The crimes with which they were charged did not involve drugs, nor were they crimes of violence. All three executed waivers of extradition from their countries of residence. In addition, Mohan had a sister-in-law in Chicago, with whom he proposed to live prior to trial, and he offered to wear an electronic device by which his continued presence in a designated area would be monitored.

Against the defendants were the factors that the district judge found decisive. At the conclusion of the hearings the district judge made written findings of fact and conclusions of law. She found as a fact that Mohan, Townsend and Whyte had no ties to the Western District of Washington. She further found that the government had presented evidence establishing that the defendants had "repeatedly exported or attempted to export" computers in violation

of export regulation; that they had "unexplained access to substantial sums of cash"; that the computers or computer goods involved were intended to be exported to the Soviet Union; and that the acquisition of this equipment by the Soviet Union was a threat to the national security of the United States.

The district judge concluded as a matter of law that the government had failed to present clear and convincing evidence that the defendants posed a present danger to the community but she also concluded that there was no condition or combination of conditions which would reasonably assure the appearance of the defendants at trial. Accordingly, she denied bail.

On August 17, 1989 the government obtained an indictment superseding the complaint filed in Buffalo. The indictment charged Mohan, Townsend and Whyte, along with Casperson, Bose, KIP and Perfect Technologies, Ltd., with conspiring to defraud the United States by using dishonest means to defeat the functions of the United States Department of Commerce and the United States Defense Department, all in violation of 18 U.S.C. § 371 and § 2. The same defendants were charged with conspiring to violate the Export Administration Regulations in violation of Title 50 U.S.C. Appendix § 2410(a) and Title 15, Code of Federal Regulations §§ 772.-1(b), 774.1, 774.2, 774.3, 774.4, 774.5, 774.6. The defendants, with the exception of Whyte, were further charged in three counts with violating the same regulations and 50 U.S.C. Appendix § 2410(b) by attempting to export computer goods to a controlled country. The same defendants, again with the exception of Whyte, were also charged with six counts of false statements in violation of 18 U.S.C. § 1001 and § 2. Finally, all of the defendants including Whyte were charged with money laundering of $1,679,940 in violation of 50 U.S.C. Appendix § 2410(a) and (b). As a result of the superseding indictment Mohan and Townsend face possible sentences of 70 years and Whyte faces a possible sentence of 35 years.

## ANALYSIS

The Bail Reform Act of 1984, as amended in 1986 and 1988, 18 U.S.C. §§ 3141–3142, determines the conditions under which bail is available. The statute specifies four factors to be considered—the nature and circumstances of the offense charged; the weight of the evidence; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or the community. 18 U.S.C. § 3142(g). If after a hearing the court determines that no condition or combination of conditions will reasonably assure the appearance of the person, the court is to order the defendant's detention. *Id.* § 3142(e).

The statute was authoritatively interpreted in *United States v. Motamedi,* 767 F.2d 1403 (9th Cir.1985) (Kennedy, J.). Motamedi was indicted for conspiracy in violation of 18 U.S.C. § 371 and for unlicensed exportation of arms in violation of 22 U.S.C. § 2778(c) and 18 U.S.C. § 2(b). The magistrate found that he was an Iranian citizen acting as a purchasing agent for the present government of Iran; that he maintained large foreign bank accounts, with deposits to them being made by the Iranian government; and that he persisted in his illegal activities despite warnings from the United States Customs and the Federal Bureau of Investigation. The magistrate concluded that no condition or combination of conditions would reasonably assure his appearance in the case. Bail was denied.

On appeal we set out the following principles, which, although established in cases antedating the Bail Reform Act, were treated by the court as not impaired by this later legislation, at least in the ordinary case where the new statute created no presumption. These principles accordingly govern here:

■ 1. Federal law has traditionally provided that a person arrested for a non-capital offense shall be admitted to bail. *Motamedi,* 767 F.2d at 1405 (citing *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951)).

2. Only in rare cases should release be denied. *Id.* (citing *Sellers v. United States*, 89 S.Ct. 36, 38, 21 L.Ed.2d 64 (Black, Circuit Justice 1968)).

3. Doubts regarding the propriety of release are to be resolved in favor of defendants. *Id.* (citing *Herzog v. United States*, 75 S.Ct. 349, 351, 99 L.Ed. 1299 (Douglas, Circuit Justice 1955)).

In light of these principles, the district court's factual findings in a bail hearing are to be reviewed under a deferential, clearly erroneous standard. *Id.* (citing *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). But the conclusions based on such factual findings present a mixed question of fact and law and require the exercise of sound judgment as to the values underlying the legal principles. *Id.* Accordingly, we make an independent examination of the record to determine whether the pretrial detention order is consistent with the defendant's constitutional and statutory rights and arrive at our conclusion *de novo.*

Specifically interpreting the Bail Reform Act, the court then held:

1. The government has the burden of proof of the risk of flight. It must do so by a clear preponderance of the evidence. *Motamedi*, 767 F.2d at 1406–1407.

2. The weight of the evidence against the defendant is a factor to be considered but it is "the least important" of the various factors. *Id.* at 1408.

3. That the defendant is an alien may be taken into account, but alienage does not by itself "tip the balance either for or against detention." *Id.*

In *Motamedi* itself, having set out these controlling guidelines, we reversed the district court and found that the government had failed to show by a clear preponderance of the evidence that Motamedi was a flight risk. In reaching this conclusion, we noted that he had been living in the Los Angeles area, where he was indicted, for nine years; that he had applied for citizenship; that he had approximately 85 relatives in the Los Angeles area, including his wife, parents and brothers; that he offered evidence disputing the government's allegation that he could return to Iran; that his parents had posted their residence in Los Angeles as security on a $750,000 bond; that he had no prior criminal record and no history of alcohol or drug abuse; and that he had known of the government's investigation since January 1984 and had nonetheless not fled the country.

Looking at the factors enumerated by the Bail Reform Act in the light of *Motamedi*, we hold, first, that the nature and the circumstances of the offenses charged here are such as to weigh against bail. Although neither violence nor the distribution of drugs are charged, the accusations are of sophisticated criminal conduct, whose successful completion required the ability to travel internationally, to adapt easily to foreign countries, and to move assets and individuals quickly from one country to another. The convoluted transactions of which the defendants are accused, involving Australia, Canada, England, India, Singapore, and the United States, the persistence with which these transactions were pursued, and the substantial funding involved, all give reason to believe that the ultimate purchaser of the computers and the computer equipment was a country anxious to acquire these goods and unable to comply with the export laws of the United States. Such a country would provide a haven for anyone accused of such offenses who jumped bail. This possibility must be taken into account in evaluating the risk of flight.

The defendants have vigorously pressed upon us their waivers of extradition, and Mohan has pointed to his willingness to be monitored electronically. But the waivers relate only to their countries of residence. In Townsend's case his waiver does not include a waiver of extradition from Britain or from the European Economic Community of which Britain is a member. In all three cases there is no waiver of extradition from the country that might provide refuge if in fact they are guilty of the offenses charged and chose to leave the jurisdiction of the United States. Nor does

the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction.

Consideration of the nature of the offenses charged involves consideration of the penalties. The defendants are charged with multiple counts, and it is reasonable, from their perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count. Whyte faces a potential sentence of 35 years, Mohan and Townsend a potential sentence of 70 years. The district court considered the case before the indictment superseding the complaint had been filed, and the potential sentences threatening the defendants were less. Even with these sentences as a possibility, the district court reasonably concluded that defendants were flight risks. We look at the case as it now stands with the indictment in place. Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.

■ Turning, secondly, to the evidence as to whether in fact they did the things of which they are accused, we cannot and do not anticipate what a jury would find or what defenses might be offered or what evidence might be excluded as hearsay or for other defects. We only determine that, as presented to the district court, the government's evidence was enough to put the defendants on notice that a combination of seized documents, recorded telephone conversations with their alleged co-conspirators, and the admissions of Casperson, made them subject to a trial in which they could reasonably believe they might be convicted. The weight of the evidence proffered tells in favor of their being flight risks.

As to their history and characteristics, apart from the offenses charged they are blameless businessmen, with particularly positive evidence existing as to the substantial reputation of Mohan. If a foreigner in the United States cannot refer to his roots in his home country, he is in a preju-

diced position when bail is considered. Whyte has substantial ties to Toronto and Mohan to New Delhi. Mohan has a good reputation as a businessman in New Delhi. Townsend has some ties with Australia. The ties to Toronto and New Delhi of Whyte and Mohan are characteristics of these defendants that operate in their favor. The reputation of Mohan is also a factor in his favor.

■ Among additional characteristics that must be considered are their ties to "the community". What "community" is meant? If it were only the community in which the indictment was brought, a defendant who had deep roots in Boston, for example, might be denied bail if indicted in New Haven. If the defendant is a United States resident, the community to be considered must be at least as broad as in the United States. Accordingly, we hold that "community" in this section of the statute embraces both the community in which the charges are brought and also a community in the United States to which the defendant has ties. *See, e.g., Truong Dinh Hung v. United States*, 439 U.S. 1326, 99 S.Ct. 16, 58 L.Ed.2d 33 (1978) (Brennan, J., in chambers) (ordering bail pending appeal because defendant "resided continuously in this country ... [for 13 years], and has extensive ties in the community"); *United States v. Himler*, 797 F.2d 156, 162 (3d Cir.1986) (reversing order of pretrial detention because of defendant's "family ties to the area").

■ When assessing an alien defendant's ties to the United States, factors to be considered include how long the defendant has resided in this country, whether defendant has been employed in the United States, whether defendant owns any property in this country, and whether defendant has any relatives who are United States residents or citizens. *See, e.g., United States v. Dominguez*, 783 F.2d 702 (7th Cir.1986) (reversing pretrial detention order for Cuban immigrants who had resided in the United States for five years and showed economic and social stability); *United States v. Khashoggi*, 717 F.Supp. 1048 (S.D.N.Y.1989) (releasing on bail the

996

famous Saudi Arabian businessman who owns property and possesses financial ties to the United States); *United States v. Honeyman*, 470 F.2d 473 (9th Cir.1972) (modifying bail requirement for British subject who has been steadily employed in the United States and owns property in the United States).

In the present case the defendants have no ties to the Western District of Washington. Townsend and Whyte have no ties to the United States—they have not resided here, they are not employed here, they do not own property here, and they have no relatives here. While Mohan has a sister-in-law in Chicago, no evidence was presented concerning the nature of the relationship. *Cf. Truong Dinh Hung v. United States*, 439 U.S. 1326, 99 S.Ct. 16, 58 L.Ed.2d 33 (1978) (Brennan, J., in chambers) (defendant "has maintained a close relationship with his sister, a permanent resident of the United States since 1969"). He has no other tie to the United States.

Also among their characteristics must be considered their access to substantial sums of cash. There is evidence that Casperson's company was supplied in a few months with over $1.6 million by those with whom he is charged as co-conspirators. Within a few days of his arrest, Mohan, a businessman from New Delhi making $60,000 a year, was supplied with $1 million bail by his friend from Switzerland. This money was not a reliable assurance of his presence for trial. "The purpose of bail is not served unless losing the sum would be a deeply-felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee." *See United States v. Szott*, 768 F.2d 159, 160 (7th Cir.1985). Loss to Lang would not have been loss to Mohan and, by his own statement as to his assets, Mohan could not have made up the loss of $1 million to Lang even if he wished to do so. Not only was Lang's offer ineffective, but as the district judge observed, "I know very few people who do have that type of friend." No doubt it is within the realm of the possible that one friend would have such confidence in another friend that he would borrow a million dollars and bet it on

the friend not trying to avoid a serious criminal trial. But it is not very probable. To advance this kind of money without further inquiry as to when the trial would be held and without any inquiry at all as to the resources of Mohan to repay him, even for the interest involved, is strange conduct for a Swiss businessman. In short, Mohan possessed instantaneous access to an enormous amount of cash from an international source whose motives, despite the testimony of the source, invite skepticism.

The fourth statutory factor to be considered is the defendants' danger to other persons or to the community. The district court has found that their release would not present dangers of this kind, and accordingly, this factor weighs in their favor.

The crimes charged required intelligence, planning, capital, facility in deception, international communications, and international motives. The crimes carry severe penalties. The government has proffered evidence that the crimes were committed. All three defendants reside in foreign countries. Mohan and Townsend frequently travel to countries other than the United States. All three defendants have no significant ties to the United States. The alleged conspirators and their alleged leader, Mohan, have unexplained access to large amounts of cash. The government established by a clear preponderance of the evidence that the three are flight risks. The district court did not err in determining that there was no condition or combination of conditions that would reasonably assure the presence of these defendants at trial.

AFFIRMED.