**UNITED STATES of America,
Plaintiff,**

v.

**Samih Fadl JAMAL, Defendant.**

**No. CR 03–0261–1–PHX–FJM.**

United States District Court,
D. Arizona.

Sept. 30, 2003.

Michael S. Reeves, Law Office of Michael S. Reeves, Phoenix, AZ, for defendant.

Kevin M. Rapp, U.S. Attorney's Office, Pjoenix, AZ, for U.S.

### ORDER

ANDERSON, United States Magistrate Judge.

The Government seeks the detention of Defendant Samih Fadl Jamal ("Jamal") upon the grounds that he is a serious flight risk and that no release condition or combination of conditions exist that would reasonably assure his appearance at future court proceedings. See, Government's Motion for Detention (document # 38) and Supplemental Motion for Detention (doc. # 153), filed on August 1, 2003 and August 27, 2003, respectively. After considering the parties' written pleadings, all the evidence and proffers,[1] the arguments of both counsel,[2] the controlling and persuasive authorities on the issues *sub judice* and all the factors set forth in 18 U.S.C. § 3142(g), the Court **FINDS** that the Government has not proven by a preponderance of the evidence that Jamal is a serious flight risk and that no combination of conditions exist that would reasonably assure his appearance at future court proceedings.

### NATURE AND CIRCUMSTANCES OF THE CRIMES CHARGED

The Government asserts that the subject charges arise from Jamal's leadership of a large fencing operation for stolen and fraudulently obtained infant formula which generated millions of dollars per year that were laundered illegally in both the United States and Lebanon. The indictment alleges the profits from the subject conspiracy are in the aggregate of $11 million. Jamal and numerous others were indicted on March 13, 2003 for the alleged commission of eight (8) felonies: Conspiracy to Commit Interstate Transportation of Stolen Property (Count 1); Interstate Transportation of Stolen Property (Counts 2, 3 and 4); False Statements (Counts 5, 6 and 7); and Conspiracy to Commit Money Laundering. The maximum possible punishments for the various charges range from 5 to 20 years in prison. Jamal has

---

1. The detention hearing was held over the course of four weeks on four separate dates: August 27, 2003, September 2, 2003, September 9, 2003 and September 23, 2003.

2. On August 29, 2003, the Hon. Frederick J. Martone denied Defendant's Motion to Seal the Government's Motion for Detention. See, document # 166. Thus, the undersigned may freely discuss the evidence and proffers presented by the Government and Defendant at the various detention hearings.

also been indicted by a Maricopa County grand jury on 63 counts of Class 3 felonies: Fraudulent Schemes and Artifices, Trafficking in Stolen Property, Illegal Control of an Enterprise, and Attempted Trafficking in Stolen Property. See, Exhibit ("Exh.") 25, Government's Motion for Detention (doc. # 38).

 The Government argues that Jamal is a serious flight risk and the charges involve sophisticated criminal conduct. As Jamal points out, however, none of the federal crimes for which Jamal has been indicted constitute a "crime of violence" as defined by 18 U.S.C. § 3156 nor do they involve drug or illegal weapons offenses. Thus, no rebuttable presumption arises pursuant to 18 U.S.C. § 3142(e)(1)(2) that Jamal is a serious flight risk or a danger to the community. Moreover, the Government does not seek detention of Jamal on the basis of danger because the Bail Reform Act does not permit his detention on this basis unless one or more of the crimes charged meet the statutory definition of "crime of violence." *United States v. Twine*, 344 F.3d 987 (9th Cir.2003). The Government does claim that Jamal is motivated to flee the United States because, if convicted, Jamal would be sentenced to significant prison terms. It contends, for example, that if Jamal were convicted on a single count of Interstate Transportation of Stolen Property, he faces a guideline sentencing range of 168 to 210 months in prison due to the imposition of numerous enhancements (i.e., twenty levels based on the amount of loss; two levels due to the

number of victims involved; two levels for receiving, and being in the business of receiving, stolen property; and four levels for Jamal's leadership role). The Government also contends that Jamal's criminal history category would likely be Category II because he allegedly committed the subject offenses while on federal probation. The Government points out that the Ninth Circuit permits the Court to consider the possible punishment as it would impact Jamal's state of mind as a motivational factor to flee the United States. In *United States v. Townsend*, 897 F.2d 989 (9th Cir.1990).

> "... The defendants are charged with multiple counts, and it is reasonable, from their perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count... Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight..."

*Id.* at 995.

The Government presented unusual but credible evidence that Jamal himself was surreptitiously recorded, pursuant to an unspecified electronic intercept authorized by the Foreign Intelligence Surveillance Act [3] ("FISA"), prognosticating that he would flee to Lebanon if the United States Government were to make claims against Jamal for back taxes.[4] Translated into English, the partial transcript reflects an Arabic conversation between Jamal and an

---

**3.** "Enacted in 1978, FISA establishes a statutory procedure whereby a federal officer, acting through the Attorney General, may obtain a judicial warrant authorizing the use of electronic surveillance in the United States for foreign intelligence purposes." *United States v. Johnson*, 952 F.2d 565, 572 (1st Cir.1991), cert. denied, 506 U.S. 816, 113 S.Ct. 58, 121 L.Ed.2d 27 (1992)("Although evidence obtained under FISA subsequently may be used

in criminal prosecutions ... the investigation of criminal activity cannot be the primary purpose of the surveillance," citing *United States v. Duggan*, 743 F.2d 59, 77 (2nd Cir. 1984)); *United States v. Sarkissian*, 841 F.2d 959, 964 (9th Cir.1988).

**4.** See, Exhibit 23 to the Government's Motion for Detention and Exhibit 1 to this detention hearing.

unidentified male on March 6, 2003. Jamal's undisputed statements provide the Court with either a candid insight into his inclination and desire to flee the United States if he were pursued for delinquent federal taxes, a much less serious legal problem than the subject criminal indictment, or a "macho" boast to enhance his anti-American image as a mentor of younger Arab–American men. According to the transcript, verified by a disclosed Arabic interpreter, Jamal stated:

> (Jamal)... I'm trying to establish a business in Lebanon, because **I know 80% to 90%, that the day will come when the American government is going to come and ask for taxes.** (Phone ringing in background). OK, that's why, **when that day comes,** (Phone ringing in background), **I'll tell them Fuck you, take everything. I'll carry myself and go to Lebanon,** understand me, because it happened with me. It happened with me three times, they came and took everything in front of me, everything in front of me, and what they didn't take, they made me spend it on lawyers, expenses and a bond, why? They come up with a little charge, and ask you to plead to a misdemeanor, misleading the public, by repackaging the formula. Fuck them... (Emphasis added).

Jamal attempts to discredit the reliability of the transcript because the Government failed to disclose and verify the unidentified male with whom Jamal is conversing and also argues that the Government did not place the conversation in the context within which it was made. Jamal further claims that the FISA warrant or order authorizing the March 6, 2003 intercept was illegal and a violation of FISA because he is not "a foreign power or an agent of a foreign power." 50 U.S.C. § 1804(a)(4)(A).

Jamal and his attorney were provided a copy of the tape and had more than sufficient time to listen to and verify it. There was no evidence presented at the *detention* hearing that would call into question the significance of the unidentified male conversing with Jamal in Arabic and how his identity would diminish the substantive statements made by Jamal. If his recorded statements were taken out of context, Jamal had the opportunity to testify or proffer what the true context was. Nothing was presented to cast doubt upon Jamal's expressed intent that he would flee to Lebanon if the United States came after him again for back taxes.

█ Additionally, it is well settled that a magistrate judge may consider evidence at a detention hearing that is challenged by a defendant to have been illegally obtained at least until the district judge determines whether it was, in fact, illegally obtained. See, 18 U.S.C. § 3142(f)("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); *United States v. Apker,* 964 F.2d 742, 744 (8th Cir.1992)(wiretap challenged); *United States v. Angiulo,* 755 F.2d 969, 974 (1st Cir.1985)(challenged information obtained via electronic surveillance may be considered regarding detention rulings at least until court determines information was illegally obtained). Additionally, no evidence was presented by either side that Jamal is or is not an agent of a foreign power.

The Government also argues that the risk of Jamal's flight is further exacerbated by the fact that the United States does not have an extradition treaty with Lebanon, Jamal's native country, where, the Government claims, Jamal is actively pursuing businesses and is expressing political aspirations. The Government has provided credible evidence that Lebanon has never extradited a person to the United States as a matter of comity or pursuant to

domestic law and alternative measures, such as deportation, have proven ineffective in returning fugitives to the United States from Lebanon. See, Exhibit 29, Government's Motion for Detention.

This detention factor weighs in favor of Jamal's detention.

### WEIGHT OF THE EVIDENCE AGAINST DEFENDANT

Of all the detention factors for the Court to consider, the Ninth Circuit has stated that the weight of the evidence is the least important of the various factors. *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir.1985); *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir.1972).

The Government has provided little information to the Court on the strengths and weaknesses, if any, of its case against Jamal. At best from the information provided by the Government at this early stage of the case, the quantum of evidence of Jamal's guilt is the probable cause found by the grand jury that the charged crimes were committed.

This detention factor and the presumption of innocence weigh in favor of Jamal's release.

### HISTORY AND CHARACTERISTICS OF DEFENDANT

Jamal is a 34–year old naturalized U.S. citizen [5] who was born in Lebanon, came to the United States in 1992 and earned a Business Administration degree from Marshal University in Huntington, West Virginia in 1993.

Jamal has substantial ties to the Phoenix community and District of Arizona. He has been living in the Phoenix area since 1996. His immediate family, including his wife, Gretchen, and five children, ages 9, 7, 4, 2 and 1, currently live in the family residence in Mesa, Arizona. Two of Jamal's brothers and his mother reside in Jamal's other residence located in Tempe, Arizona. Jamal's father and three other siblings live in Lebanon; another brother resides in Tempe and yet another in Texas. He maintains frequent contact with all his family and travels often to Lebanon, most recently in February and May, 2003 for usually a two to three week visit. Mrs. Jamal and her children lived in Lebanon from 1996 to 1999 while Jamal lived in the United States. His wife has voluntarily consented to surrender her passport, visa or international travel documents and those of all the minor children as a good faith gesture that neither she nor her husband intend to flee the United States. Although possible if sufficiently motivated, it is not reasonable to anticipate that Jamal would abandon his wife, children, mother and siblings in the United States by fleeing to Lebanon.

In addition to real estate he owns in Lebanon,[6] Jamal is the titled owner of two Arizona residential properties; one located in Mesa (Sorenson Street) and the other in Tempe (Watson Drive). Jamal and his immediate family have lived in the Mesa

---

**5.** Jamal was naturalized on January 31, 1996. The Government alleges that Jamal provided false information in three separate I–864 forms to the former Immigration and Naturalization Service denying he was financially supporting other immigrants and, thus, the Government claims it will be seeking the revocation of his U.S. citizenship. For denaturalization of citizenship to occur, the misrepresentations or concealments must be both willful and material. 8 U.S.C. § 1451(a); *Kungys v. United States*, 485 U.S. 759, 767, 108 S.Ct. 1537, 1544, 99 L.Ed.2d 839 (1988). The Court finds the possibility of denaturalization so speculative that the Court gives this argument no weight.

**6.** Jamal's Personal Financial Statement confirms that Jamal owns vacant land in Lebanon worth $500,000.00 without any liens thereon. Exh. F, Government's supplemental Motion for Detention.

residence since May, 2003 while his mother and siblings currently live in the Tempe residence. Since the evidence of Jamal's equity and debt related to these residential properties was disputed, the Court finds that the Government's evidence is more credible due to the supporting documentation provided by the Government. The recorded documents themselves seemingly reflect that Jamal has approximately $50,000 equity in the Mesa (Soreson) residence [7] and no equity in the Tempe (Watson) residence.[8] The Government, however, has provided credible information that the sellers of the Sorenson property, Harvey and Anne Cook, loaned Jamal $113,000.00 so Jamal could make the $118,000 cash down payment reflected in the Affidavit of Property Value to purchase this residence. See, Exh. E, Government's Supplemental Motion, doc. # 153. Thus, in reality, Jamal made only a $5000.00 out-of-pocket investment in the Sorenson property. Therefore, the Court finds that Jamal has only approximately $5000.00 equity in the Mesa (Sorenson) residence and no equity in the Tempe (Watson) one.[9] In sum, there are insufficient financial incentives to voluntarily keep Jamal in the United States pending trial. It is not reasonable to expect that Jamal would not flee to Lebanon because, by doing so, he would forfeit only the minimal investments and equity in his Arizona real property.

As a U.S. citizen, Jamal may be legally employed in the United States. He is currently a self-employed businessman whose business practices form the basis of the subject indictment. He reports ownership of Jamal Trading Company, located in Tempe; partial ownership on Arizona Nutrition Stores with three Valley locations; Baby's World and Kid's Treasurers, a baby clothing store. Due to the subject indictment, Jamal indicated to Pretrial Services that the only business currently in operation is Kid's Treasurers which he has owned since July, 2003. Despite the Government's unsupported rhetoric that Jamal "has never had legitimate employment in the United States and his illegal business constituted his entire source of income" in the United States, doc. # 38, p. 11, Jamal, if released from custody, may be gainfully and lawfully employed in his baby clothing business pending trial.

7. The Sorenson residence was purchased for $551,500.00 on February 28, 2003 and was, and remains, encumbered by a deed of trust with BNC Mortgage, Inc. executed in March, 2003 for $441,200.00 and a second deed of trust in the sum of $54,650.00 to the beneficiaries, Harvey and Anne Cook, from whom Jamal purchased the property. See, Exh. E, Government's Supplemental Motion, doc. # 153.

8. The Watson residence was purchased for $115,500.00 in 1999 and was, and remains, encumbered by a deed of trust with Countrywide Home Loan in January, 2003 for $112,245.00 and a second deed of trust in the sum of $55,650.00 to the beneficiaries, Harvey and Anne Cook, from whom Jamal purchased the Sorenson property. On his Personal Financial Statement (*Id.* at Exh. F), Jamal claims the residence is worth $150,000 as of January 2002. *Id.* at p. 2. No credible evidence of current real market value, however, was presented by Jamal at the detention hearing except the Affidavit of Property Value (a required document under Arizona law signed by the parties prior to close of escrow) provided by the Government regarding the Sorenson property. See, Exh. E, Government's Supplemental Motion, doc.# 153.

9. The Court notes, without finding, that by leasing the Watson residence to his family members and by his residing in the Sorenson residence, Jamal may be violating the terms of Jamal's deed of trust with Countrywide Home Loan because the Watson residence is no longer his "primary residence" or by leasing it out, the Watson residence has become commercial property. *Id.* at paragraph 6, Deed of Trust, page 5; *Midfirst Bank v. Ranieri,* 257 Mont. 312, 848 P.2d 1046 (1993).

The Government contends that Jamal's illegal businesses generated over $11 million but only $300,000.00 has been seized by the Government. Therefore, the Government argues, Jamal secretly controls the remainder of this money within or outside the United States which provide him with a strong incentive and the means to flee the United States. The Government, however, fails in its presentation of evidence, and the reasonable inferences therefrom, that Jamal's alleged illegal businesses generated the significant sums of money the Government claims they did. In fact, Jamal's residential real estate documents paint a picture of a home buyer leveraging all of his equity in his first residence to qualify to borrow money for a home loan to purchase a second residence for his mother and brothers. This is hardly the picture of multi-millionaire swindler, swimming in cash.

On balance, these detention factors weigh in favor of Jamal's release.

## NATURE AND SERIOUSNESS OF THE DANGER TO RELEASE DEFENDANT

Jamal does have a criminal history in the United States but it does not involve a conviction for a crime of violence or the illegal distribution of drugs or firearms. He does not have an illicit drug or alcohol abuse history. Jamal voluntarily tested negative for drugs by Pretrial Services shortly after his arrest on July 30, 2003.

After being indicted in the Eastern District of Kentucky on 33 felony counts in 1998, Jamal pled guilty to only aiding and abetting the distribution and misbranding of infant formula, a Class A misdemeanor, in violation of 21 U.S.C. §§ 331(a), 333(a)(1) and 18 U.S.C.2. He was placed on three years probation by the Hon. Karl S. Forester, U.S. District Judge on or about January 29, 1999. The terms of his federal probation included providing his proba-

tion officer with access to any requested financial information, including his business and tax records. Knowing that one's business records were subject to review at any time by a probation officer, it is not reasonable to expect one would engage in the white-collar crimes alleged in the indictment. Except for the pending charges, there is no evidence or suggestion that Jamal violated any of the terms of his 1999 federal probation. More importantly for purposes of the subject motion, there is no evidence that Jamal failed to appear at any of his court appearances in the Kentucky case as required by the district court or that he violated any of the terms of his pretrial release pending resolution of the matter. Jamal's demonstrated history of appearing in Court when faced with equally serious felonies in Kentucky is a significant factor favoring Jamal's release.

These detention factors weigh in favor of Jamal's release.

## DISCUSSION

The Court is mindful that "only in rare circumstances should release be denied," *Sellers v. United States,* 89 S.Ct. 36, 38, 21 L.Ed.2d 64 (1968) (Black, J., in chambers); *United States v. Motamedi,* 767 F.2d at 1407, and "doubts regarding the propriety of release should be resolved in favor of the defendant." *Herzog v. United States,* 75 S.Ct. 349, 351, 99 L.Ed. 1299 (1955); *United States v. McGill,* 604 F.2d 1252, 1255 (9th Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). Additionally, the Bail Reform Act also mandates release of a person facing trial under "the least restrictive" condition or combination of conditions that will reasonably assure the appearance of the person as required. 18 U.S.C. § 3142(c)(2) (1984); *United States v. Motamedi,* 767 F.2d at 1407["we are not unmindful of the presumption of innocence

and its corollary that the right to bail should be denied only for the strongest of reasons", citing *Truong Dinh Hung v. United States*, 439 U.S. 1326, 1329, 99 S.Ct. 16, 58 L.Ed.2d 33 (1978)]. Alienage is also a factor which may be taken into account, but by itself cannot be determinative. *Motamedi*, 767 F.2d at 1408.

█ Opportunity to flee is not enough to justify detention as the Bail Reform Act does not seek ironclad guarantees. *United States v. Himler*, 797 F.2d 156 (3rd Cir.1986). The requirement that the conditions of release "reasonably assure" a defendant's appearance cannot be read to require guarantees against flight. *United States v. Chen*, 820 F.Supp. 1205, 1208 (N.D.Cal.1992).

█ The Government's burden of proof for detention is not trivial. The Government must point to more than the indictment and, perhaps, his braggadocios comment to a young Arabic-speaking male of what Jamal would do if the United States came after him again for taxes to justify detention. It must prove by a preponderance of the evidence that the defendant poses a "serious" flight risk. 18 U.S.C. § 3142(f)(2)(A)("a serious risk that such person will flee;"); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991). It has failed to do so in this case on the evidence presented.

Based upon all of the foregoing and the evidence presented at the subject detention hearings,

The Court **FINDS** that the Government has not sustained its burden of proof by a preponderance of the evidence that Jamal is a serious flight risk and that no condition or combination of release conditions would reasonably assure his appearance at future Court proceedings as required were he to be released.

The Court **FURTHER FINDS** that Jamal is a moderate flight risk but there are a combination of release conditions that would reasonably assure his appearance at future court proceedings, including, but not limited to, the posting of a $150,000.00 cash bond, the temporary surrender of his wife's and children's passports, visas or other international travel documents to the FBI, electronic monitoring with restricted work-day and non-work day travel except upon the express prior approval of Pretrial Services.

The Court **FURTHER FINDS** that the imposition of the subject cash bond, which may be posted by family or friends, is an indispensable component of Jamal's release conditions that will likely further assure Jamal's appearance at future court proceedings herein as he will not likely risk financial ruin to his trusting, beloved family members or friends by failing to comply with the Court's orders. *United States v. Mantecon–Zayas*, 949 F.2d 548 (1st Cir.1991)(explanation is required why the particular release condition is an indispensable component for release).

Upon the posting of the subject bond by cashier's check with the Clerk, defense counsel is authorized to contact the undersigned's Judicial Assistant and Pretrial Services to schedule a bag and baggage hearing at which time a separate release order will be signed and entered.

Accordingly,

**IT IS ORDERED** that Government's Motion for Detention (doc. # 38) and Supplemental Motion for Detention (doc. # 153) are **DENIED**.