**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JESUS PEREZ GARCIA,

*Defendant-Appellant*.

No. 22-50314

D.C. No.
3:22-cr-01581-
GPC-2

ORDER

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JOHN THOMAS FENCL,

*Defendant-Appellant*.

No. 22-50316

D.C. No.
3:21-cr-03101-
JLS-1

Filed September 4, 2024

Before: Kim McLane Wardlaw, Richard R. Clifton, and
Gabriel P. Sanchez, Circuit Judges.

Order;
Concurrence by Judge Sanchez;
Dissent by Judge VanDyke

## SUMMARY[*]

### Criminal Law

The panel denied a petition for panel rehearing and a petition for rehearing en banc in consolidated appeals in which the panel issued an opinion (1) denying a motion brought by the two defendants to dismiss the appeals as moot and (2) providing its full rationale for its previous order affirming the district court's orders subjecting defendants to a condition of pretrial release that temporarily barred them from possessing firearms pending trial.

Judge Sanchez, joined by Judges Wardlaw, Clifton, Koh, Sung, H.A. Thomas, and Mendoza, concurred in the denial of rehearing en banc. Judge Sanchez wrote separately to make two points. First, the appeal is clearly unworthy of en banc review, as such review is not necessary to secure or maintain uniformity of the court's decisions and the proceeding does not involve a question of exceptional importance. Second, the Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), vindicates the panel's analysis.

Dissenting from the denial of rehearing en banc, Judge VanDyke wrote that even though mootness deprived the court of the ability to review the merits of the panel's decision, the court should have taken the case en banc to vacate the panel's opinion. He wrote that after the panel moot-proofed the case by issuing an unreasoned, placeholder order denying relief to defendants on the same day as oral

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

argument, the panel provided its reasoning in an unnecessary opinion that (1) went out of its way to opine on a tradition— of disarming "dangerous" people—that has the potential to affect countless other, unrelated cases; and (2) gratuitously stretched to help the government meet its burden of producing historical analogues that justify its regulation. Judge VanDyke wrote that against this background, errors in the panel's merits analysis—which abstracts the history to such a high level of generality that it essentially returns to the realm of interest-balancing, all while failing to hold the government to its burden—become all the more problematic, and presents an exceptional circumstance in which it would have been appropriate for the court to exercise its equitable discretion to vacate the panel's opinion.

## ORDER

The panel unanimously voted to deny the petition for panel rehearing. Judges Wardlaw and Sanchez voted to deny the petition for rehearing en banc, and Judge Clifton so recommends. The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35. Judges Owens and Bumatay did not participate in the deliberations or vote in this case.

The petition for panel rehearing and rehearing en banc, **Dkt. 31,** is DENIED. No further petitions for rehearing en banc will be considered.

SANCHEZ, Circuit Judge, joined by WARDLAW, CLIFTON, KOH, SUNG, H.A. THOMAS, and MENDOZA, Circuit Judges, concurring in the denial of rehearing en banc:

In *United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024), we unanimously held that the Government could temporarily disarm two criminal defendants—Jesus Perez-Garcia and John Fencl—pending their felony trials consistent with the Bail Reform Act of 1984 and the Second Amendment. Perez-Garcia stood accused of importing eleven kilograms of methamphetamine and half a kilogram of fentanyl through the southern border. *Id.* at 1171. Fencl faced up to seventy years in prison for felony unlawful possession of three unlicensed short-barreled rifles and four unlicensed silencers. *Id.*

Because neither Fencl nor Perez-Garcia remains subject to any pretrial release conditions, all agree that "there is now *no* live controversy before our court regarding either the merits of the underlying case or the propriety of the [firearms condition]." *Washington v. Trump*, 858 F.3d 1168, 1169 (9th Cir. 2017) (Berzon, J., concurring in the denial of reconsideration en banc). And "[i]n our system of government, courts have 'no business' deciding legal disputes or expounding on law in the absence of such a case or controversy." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). Nevertheless, Fencl and Perez-Garcia filed a petition for rehearing en banc seeking the concededly "unusual remedy" of equitable vacatur. *See* Dkt. 31, at 3. Today, our court correctly denied the petition.

A single judge of our court dissents from the order denying the petition for rehearing en banc. I join my

colleagues who have voiced concern about these so-called "dissentals," which often present a "distorted presentation of the issues in the case, creating the impression of rampant error in the original panel opinion although a majority—often a decisive majority—of the active members of the court . . . perceived no error." *Defs. of Wildlife Ctr. for Biological Diversity v. EPA*, 450 F.3d 394, 402 (9th Cir. 2006) (Berzon, J., concurring in denial of rehearing en banc); *see also* Marsha S. Berzon, *Dissent, "Dissentals," and Decision Making*, 100 Cal. L. Rev. 1479, 1491 (2012).

The dissent in this case, though, is particularly curious. In a case where—everyone agrees—we lack jurisdiction to rehear the merits of the appeals, one judge has taken it upon himself to write a 61-page advisory opinion. Only about 5 of those 61 pages purport to address the relevant question at hand—what exceptional circumstance, if any, renders en banc review appropriate? The rest details Judge VanDyke's views of the Second Amendment and his disagreements with the three-judge panel decision. As we have long recognized, critiques of this nature are irrelevant because "[w]e do not take cases en banc merely because of disagreement with a panel's decision, or rather a piece of a decision." *Hart v. Massanari*, 266 F.3d 1155, 1172 n.29 (9th Cir. 2001) (quoting *E.E.O.C. v. Ind. Bell Tel. Co.*, 256 F.3d 516, 529 (7th Cir. 2001) (en banc) (Posner, J., concurring)).

I concur in the denial of rehearing en banc, and I write separately to make two brief points. First, this appeal is clearly unworthy of en banc review. Second, the Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), vindicates the analysis in *Perez-Garcia*.

I.

The grounds for rehearing en banc are well established. En banc review is limited to circumstances where it is (1) "necessary to secure or maintain uniformity of the court's decisions" or (2) "the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a). Our court correctly determined that neither circumstance is present here.

*Perez-Garcia* does not conflict with any decision of the Supreme Court, this court, or any other circuit court. In concluding that the Bail Reform Act's firearm condition did not violate the Second Amendment as applied to Perez-Garcia and Fencl, *Perez-Garcia* addressed a question of first impression. Nor does the opinion present a question of "exceptional importance." Fed. R. App. P. 35(a)(2). Because Fencl and Perez-Garcia raised as-applied challenges, the opinion considered only whether the Bail Reform Act's firearm condition violates the Second Amendment *as applied to them*. We did "not take up the question whether the firearm condition may theoretically be applied to others." *Perez-Garcia*, 96 F.4th at 1182 n.13.

Nevertheless, Fencl and Perez-Garcia, as well as the dissent, would convene an en banc court for the sole purpose of considering whether to exercise our discretion to grant the remedy of "equitable vacatur." To my knowledge, we have never done that before, at least not in recent memory. It would have been a particular waste of judicial resources here because the remedy sought—equitable vacatur—could not

possibly affect the parties.[1] Yet the dissent argues that "[t]he facts surrounding the panel's opinion rendered the circumstances exceptional enough to warrant vacating it" and offers two "exceptional" circumstances making the case en banc worthy. *See* Dissent from Denial of En Banc at 64.

First, the dissent says that the panel "went out of its way to needlessly analyze the history of disarming 'dangerous' individuals." *See id.* We "did not have to do so," it goes on, because we had already concluded that the Bail Reform Act's firearm condition, as applied to Fencl and Perez-Garcia, is consistent with a historical tradition of subjecting criminal defendants to temporary restrictions on their liberty. *See id.*

The use of alternative holdings, however, is not a reason to convene an en banc court. As we have repeatedly explained, "[a]lternative holdings are a common practice that prevents the overconsumption of adjudicative resources." *Bahr v. Regan*, 6 F.4th 1059, 1071 n.12 (9th Cir. 2021) (quoting *Container Stevedoring Co. v. Dir., Office of Workers Comp. Programs*, 935 F.2d 1544, 1549 n.5 (9th Cir. 1991)). Consistent with that practice, *Perez-Garcia* affirmed the firearm condition based on alternative rationales. *See Perez-Garcia*, 96 F.4th at 1182–86 (first rationale); *id.* at 1186–91 (second rationale). Both rationales were briefed and argued by the parties. The Government specifically argued that the firearm condition is justified by "(1) historical restrictions on indicted defendants, including pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy; and

---

[1] Fencl was convicted and sentenced, while Perez-Garcia absconded and had his bond revoked. As a result, neither Appellant is subject to the pretrial release condition that was at issue in this emergency appeal.

(3) historical surety laws restricting the gun rights of people accused of posing a threat." And Appellants forcefully contested all three grounds. The three-judge panel opinion simply agreed with the Government's position. Nothing about the use of alternative holdings warrants en banc review.[2]

Second, the dissent argues that *Perez-Garcia* cited certain historical sources that did not appear in the Government's brief. *See* Dissent from Denial of En Banc at 65. This was improper, it contends, because under *Bruen* the Government bore the burden of justifying its application of the firearm condition to Fencl and Perez-Garcia as consistent with our nation's historical tradition of firearm regulation. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).

The dissent is incorrect and, in any event, fails to raise an en banc-worthy issue. In concluding that the Government met its burden of showing that Fencl's and Perez-Garcia's temporary disarmament was consistent with our nation's historical tradition of firearm regulation, *Perez-Garcia*

---

[2] The dissent at times suggests that the panel went out of its way to decide issues raised in a "moot" case. That is incorrect. We affirmed Appellants' firearm conditions in a consolidated dispositive order, stating that "an opinion explaining this disposition will follow." *Perez-Garcia*, 96 F.4th at 1172. Appellants do not dispute that we had jurisdiction when we issued our dispositive order resolving the merits of their appeal. The opinion that followed "merely explain[ed] the basis for [our] decision and d[id] not take further action on the merits." *Id.* at 1173. As the opinion explained, "it is not uncommon for appellate courts to resolve urgent motions by filing an expedited and summary order, later to be followed by an opinion that provides the reasoning underlying the order." *Id.* (citing numerous examples); *see also Armster v. U.S. Dist. Ct. for Cent. Dist. of California*, 806 F.2d 1347, 1355 (9th Cir. 1986); *Hassoun v. Searls*, 976 F.3d 121, 129 & n.4 (2d Cir. 2020).

addressed the same categories of laws that the Government cited in its brief (*e.g.*, founding-era sources such as English laws, American laws restricting gun possession by various groups, and American laws allowing disarmament for certain types of conduct, like affray and surety statutes); addressed sources that were discussed in articles cited in the Government's briefs (*e.g.*, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020)); and addressed sources cited in *Bruen*, *District of Columbia v. Heller*, 554 U.S. 570 (2008), or both (*e.g.*, the English Bill of Rights, convention proposals). *See Perez-Garcia*, 96 F.4th at 1186–91.

Where the opinion cited other historical sources, it was appropriate to do so. At the end of the day, whether a given regulation is consistent with the Second Amendment is a question of law. *See United States v. Chovan*, 735 F.3d 1127, 1131 (9th Cir. 2013), *abrogated on other grounds by Bruen*, 597 U.S. at 17; *United States v. Oliver*, 41 F.4th 1093, 1097 (9th Cir.), *cert. denied*, 143 S. Ct. 503 (2022); *see also Does v. Wasden*, 982 F.3d 784, 793 (9th Cir. 2020) (noting the "longstanding principle" that "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law" (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991))). Courts do not, as a general practice, confine their review of legal questions only to cases and authorities cited by the parties, and it would not have made sense to do so here where briefing arose in the context of an expedited appeal from an emergency motion for relief. In short, a more fulsome analysis of the history and tradition of firearms regulation

underpinning Appellants' Second Amendment claims is not an exceptional circumstance warranting en banc review.

## II.

The vast majority of the dissent details Judge VanDyke's critiques of the merits of the *Perez-Garcia* opinion. *See* Dissent from Denial of En Banc at 21–66. The dissent raises various points but basically chides the opinion for drawing historical analogies that, in his view, are too broad or too vague.

I hesitate to spend time relitigating the merits of *Perez-Garcia* because "[i]t is simply not an 'exceptional circumstance[]' justifying the 'extraordinary remedy of vacatur' that members of our court disagree with a panel opinion." *Washington*, 858 F.3d at 1169 (Berzon, J., concurring in the denial of reconsideration en banc) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26, 29 (1994)). Fencl and Perez-Garcia raised similar arguments about the level of generality *Bruen* requires, which the opinion addressed at length. *See Perez-Garcia*, 96 F.4th at 1184–86, 1189–91. Two points, however, bear mentioning.

First, the Supreme Court's recent decision in *Rahimi* vindicated our conclusion that the firearm condition as applied to Fencl and Perez-Garcia fits within the Government's proffered historical tradition of "disarming people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *Id.* at 1189. As the Court explained in *Bruen*, "whether modern and historical [firearm] regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry."

597 U.S. at 29 (internal quotation marks omitted).  Applying *Bruen*'s analogical approach in *Perez-Garcia*, we found the firearm condition consistent with *why* legislatures have traditionally regulated Second Amendment rights because the condition was specifically designed to disarm those whose possession of firearms would pose an unusual danger to the community.  *See Perez-Garcia*, 96 F.4th at 1189 (citing 18 U.S.C. § 3142(c)(1)(B)).  We also found the condition consistent with *how* legislatures have historically disarmed because, as applied to Fencl and Perez-Garcia, the condition was narrow,[3] temporary, individually tailored, and imposed only after neutral judicial officers found it necessary to protect public safety.  *See id.* at 1189–91.

The Supreme Court took the same approach in *Rahimi*. The question there was whether a federal statute prohibiting an individual subject to a domestic violence restraining order from possessing a firearm could be enforced consistent with the Second Amendment.  *See Rahimi*, 144 S. Ct. at 1894. The Court had "no trouble" answering that question in the affirmative.  *Id.* at 1902.

Citing surety laws and affray laws banning the offense of arming oneself to terrify the public, *Rahimi* identified a historical tradition of "disarm[ing] individuals who present a credible threat to the physical safety of others."  *See id.* at 1902, 1899–1901.  The Court held that the federal statute at issue, 18 U.S.C. § 922(g)(8), "fits comfortably within this

---

[3] "Narrow" in the sense that the Bail Reform Act's firearm condition concerns only the rights of a narrow segment of the population arrested and charged with federal crimes and thus does not broadly "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."  *See Perez-Garcia*, 96 F.4th at 1189; *cf. Bruen*, 597 U.S. at 71.

tradition," *id.* at 1897, because it "does not broadly restrict arms use by the public generally," "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another," and was "temporary" as applied to the defendant. *See id.* at 1901–02 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). In other words, the Supreme Court upheld the law because it was narrow, temporary, and applied only after neutral judicial consideration of a credible threat to public safety. *Perez-Garcia* fits comfortably within this analysis.[4]

The dissent also challenges the three-judge panel opinion's conclusion that applying the condition to Fencl and Perez-Garcia "is justified by our nation's history of disarming criminal defendants facing serious charges pending trial." *Perez-Garcia*, 96 F.4th at 1182. None of the dissent's proffered "exceptional circumstances" warranting en banc review (*i.e.*, alternative holdings and extra citations) apply to this specific holding. Regardless, the dissent's critique cannot be squared with *Rahimi*.

*Perez-Garcia* explained that the modern practice of disarming criminal defendants facing serious charges

---

[4] The dissent misconstrues the phrase "law-abiding, responsible citizen" in *Perez-Garcia*, suggesting that it would permit the government to disarm individuals "who are not law-abiding, responsible citizens." *See* Dissent from Denial of En Banc at 59. Not so. *Perez-Garcia*'s analysis of the Government's proffered historical tradition, and its application to Fencl and Perez-Garcia, centered on dangerousness, rather than responsibility or mere propensity to follow the law. *See Perez-Garcia*, 96 F.4th at 1189 ("We conclude that the Bail Reform Act's firearm condition as applied to Fencl and Perez-Garcia fits within the Government's proffered historical tradition of disarming people whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others.").

pending trial comes from three separate but related founding era practices: (1) most serious crimes were eligible for capital charges; (2) the government had the power to detain defendants indicted on capital charges; and (3) once detained, criminal defendants were completely disarmed. *See id.* As the opinion explained, the historical record shows that Anglo-American legislatures have long retained the power to detain and disarm for even nonviolent crimes like forgery, horse theft, and running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars. *See id.* at 1183–84 (collecting sources). We concluded that temporarily disarming Fencl and Perez-Garcia today for, respectively, facing seventy years' imprisonment for serious felony offenses related to violating gun safety laws and importing kilograms of fentanyl and methamphetamine, is fully consistent with that historical tradition. *See id.* at 1185.

The dissent basically argues that *Perez-Garcia* applied the wrong level of generality. In its view, "the scope of 'serious crimes' is . . . too broad to be analogous to the specific crimes the Founders made punishable by death." *See* Dissent from Denial of En Banc at 38. Under this reading of the Second Amendment, Fencl and Perez-Garcia cannot be temporarily disarmed pending their felony trials because "[n]either of them is alleged to have committed a capital crime [a]nd nor are their crimes analogous to Founding-era capital crimes." *See id.* at 42.

*Rahimi* thoroughly discredited this line of reasoning. In that case, "the Government ha[d] not identified a founding-era or Reconstruction-era law that specifically disarmed domestic abusers," *Rahimi*, 144 S. Ct. at 1904 (Sotomayor, J., concurring), and yet the Supreme Court still had "no trouble" finding Section 922(g)(8) sufficiently analogous to

the founding era regimes of surety and affray laws. *Id.* at 1902. In so doing, the Supreme Court clarified an important methodological point that bears repeating here: rather than asking whether a present-day gun regulation has a specific historical analogue, courts must instead consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). As the concurrences explained, requiring overly specific historical analogues, as the dissent would, "forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber,'" and mistakenly "assumes that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring); *see also id.* at 1904–06 (Sotomayor, J., concurring).

In light of *Rahimi*, disarming Fencl and Perez-Garcia pending trial for their felony offenses is fully consistent with the historical practice of temporarily disarming those accused of serious but nonviolent crimes. Our court was right to conclude that both substantively and procedurally, this appeal does not warrant en banc review.

---

VANDYKE, Circuit Judge, dissenting from the denial of rehearing en banc:

For a majority of the judges on the Ninth Circuit, "any loss in a Second Amendment challenge at the Supreme Court is celebrated as a tool to further our artificial cabining of *Bruen*." *Duarte v. United States*, 108 F.4th 786, 788 (9th Cir. 2024) (VanDyke, J., dissenting from the grant of rehearing en banc). Now, barely weeks after I levied this pointed charge in my *Duarte* disgrantle, our circuit seems

determined to prove I'm right. The court not only declines to vacate a lengthy, deeply flawed, and wholly unnecessary Second Amendment opinion issued long after the defendants' constitutional challenges became moot. It also piles on even more advisory commentary in a concurral, this time about *United States v. Rahimi*, 144 S. Ct. 1889 (2024)— a decision released months after the panel issued its opinion—and what *Rahimi* means for the analogical approach required by *Bruen* moving forward.

The observation I have made repeatedly in cases like this keeps being validated: our circuit is "more interested in sidestepping than following the [Supreme] Court's Second Amendment precedent" by "latch[ing] onto phrases" and "conveniently overlooking such bothersome details like the government's burden of supplying relevantly similar historical analogues." *Duarte*, 108 F.4th at 788 (VanDyke, J., dissenting). Add this case to the top of the list. This latest effort stems from a particularly enticing opportunity for Second Amendment shenanigans, as the panel first rushed to issue a terse, unreasoned order affirming the district court. That order deliberately moot-proofed the panel's ability to issue what was effectively, if not technically, an advisory opinion long after subsequent events overtook the defendants' claims. More than a year later, the panel then made the most of the opportunity it had generated for itself, announcing as much new law as possible in a moot case where it was wholly unnecessary to do so, and then using mootness as a shield to argue against en banc review. Judge Reinhardt would be proud.

I'll explain in a moment why this case should have been taken en banc and summarily vacated. But first, I offer a brief response to my colleagues' attack on this dissental as unnecessary.

First, I must say I respect the feisty energy emanating from my concurring colleagues' attempted pushback. But there is that thing about living in glass houses and throwing rocks. Consider what the panel did here: (1) it took the highly unusual step of quickly issuing a summary decision in a case that was likely to become moot, which served no discernable purpose except to ensure the panel could still issue its opinion long after doing so became unnecessary; (2) it later issued that lengthy and needless opinion notwithstanding the fact that everyone—including the panel—agreed the case was moot; (3) it unnecessarily provided redundant alternative rationales in its opinion deciding important Second Amendment issues in this circuit that could have far-reaching effects well beyond just this moot case; and (4) it deliberately reached outside the history and resources provided by the government in this case in an obvious attempt to *help* the government meet its burden rather than hold the government to it. That many off-panel members of the court now gratuitously rush to signal their agreement with the panel's gratuitous legal reasoning in a concurral strangely criticizing my disagreement as gratuitous really deepens the irony. Projection, anyone?

The panel's layers of overreaching would alone be cause for concern even if it had nonetheless gotten the law right. But it instead applied a very flawed historical analysis. Showing that is the principal point of this dissent. Given that purpose, are my colleagues correct that it's wholly unnecessary, or unnecessarily long?

I wish it was unnecessary, or at least shorter. But if I'm correct that the panel's gratuitous decision is deeply flawed and will propagate similar errors in future cases, then it's hardly unnecessary to point that out. That is a key purpose

for calling cases en banc, and for dissenting when our court fails to heed that call.

And while the length of this dissental is certainly unfortunate, it's the necessary result of two factors. First, the panel needlessly provided multiple deeply flawed alternative analyses in an extended opinion of its own *spanning nearly 50 pages*. And second, after *Bruen*, a proper historical analysis in Second Amendment cases simply cannot be done cursorily. My colleagues are of course entitled to disagree with my historical analysis. But nowhere do they even attempt to explain how I could demonstrate that the panel's lengthy decision is not just unnecessary, but also egregiously wrong, without a similarly lengthy historical analysis.

Stripped of this strange and misguided attempt to discredit my dissental as too historically detailed, the concurral's only other explanation for why en banc review was unwarranted is that *Rahimi* has now blessed the panel's highly generalized analogical approach. Bingo. *That*, folks, cuts through all the deflection and zeroes in on the real disagreement between me and the panel.

The panel and a majority of our court thinks *Rahimi* allows historical analogizing at a high level of generality: a court should extract certain "principles" from historical "analogues," and then ask if those generalized principles are somehow implicated in this particular case. But such an approach allows judges to uphold basically any gun regulation or ban, because, as illustrated by the panel's opinion here, highly generalized principles like "dangerousness" and "responsibility" can easily be extracted from almost any historical law and then just as easily applied to justify effectively anything. As at least one Supreme

Court Justice has already cautioned, an approach like the panel's results in giving only lip-service to the Second Amendment. *See Rahimi*, 144. S. Ct. at 1926 (Barrett, J., concurring) (warning that "a court must be careful not to read a principle at such a high level of generality that it waters down the right" in a way that basically any group or individual characteristic could be linked to any conceivable danger).

For judges looking for a way to fill the void in judicial discretion left by *Bruen*'s elimination of interest-balancing, this highly generalized approach to historical analogizing is the best game in town. And as my colleagues' concurral helpfully demonstrates, many judges of this court view *Rahimi* as a license to over-generalize to their hearts' content. I already explained in my *Duarte* disgrantle why that's wrong, and I expand on that in my historical analysis below. And my *Duarte* disgrantle did warn that this court would "joyride *Rahimi* … like a stolen Trans Am" in the inevitable Second Amendment firefight to come. *Duarte*, 108 F.4th at 788 (VanDyke, J., dissenting). Barely a few weeks have passed, and my colleagues are already taking their new whip out for a spin in their concurral. More extended rides will undoubtedly follow soon.

I urge readers to review the panel's wholly unnecessary opinion in this case—along with the concurral's mostly diversionary attempt to defend it—and compare it to the historical analysis in my dissental. If, in your view, the panel's opinion looks like how the Supreme Court expected lower courts to apply *Bruen* and *Rahimi*, then maybe, as the panel and a majority of our court would like everyone to think, there is nothing to see here. But if not, well, don't say I didn't warn you.

## I.

While much of my colleagues' concurral is misguided, it is at least correct to observe that my dissental is long. Of course, I wouldn't have to write such a lengthy critique if my colleagues had taken this moot case en banc and vacated the panel's original lengthy opinion. But here we are. So for those without the bandwidth to read my historical analysis below in full, I offer the following summary:

This case presented the question of whether defendants Perez-Garcia and Fencl could be disarmed while on pretrial bail consistent with our nation's tradition of firearm regulation. The panel provided a characteristic answer to that question with uncharacteristic haste, entering a four-sentence order denying relief to both defendants on *the same day* as oral argument. Such unreasoned, placeholder orders are very rare because our court almost always issues a final disposition in a case only after finalizing and simultaneously releasing the reasoned decision—generally many months after oral argument for a published opinion. One can imagine unusual circumstances in which extraordinary action like the panel's might be necessary—when, for example, a panel concludes it must immediately change the status quo but fears the case will be overtaken by events while it drafts its opinion. But that's not what happened here. Here, the panel's order merely *affirmed* the district court's decision, which denied relief to the defendants and did not alter the status quo. Absent any other reasonable explanation, the only motive I can surmise for the panel's unusual approach was a desire to effectively moot-proof its ability to later issue an opinion—and make lots of new law in a controversial area—notwithstanding the predictable intervening mootness that followed.

After immediately moot-proofing the case, the panel then took its sweet time, finally providing its (lengthy) reasoning in an unnecessary opinion issued *more than a year later*. That opinion first examined our tradition of detaining—and therefore disarming—capital defendants before trial. Then it redundantly decided the question *again*, performing a separate and distinct historical analysis of our tradition of disarming "dangerous" people. That latter tradition is potentially relevant to a host of other Second Amendment challenges percolating through the courts, including challenges to the various provisions of 18 U.S.C. § 922(g). The panel's first analysis was sufficient to decide the case before it. But instead of stopping there, it went out of its way to opine—in a case that the panel knew was moot anyway—on a tradition that has the potential to affect countless other, unrelated cases.

The panel didn't just reach to decide unnecessary issues in a moot case—it also gratuitously stretched to help the government meet its burden and support the panel's desired outcome. The Supreme Court has been clear that the burden of introducing historical analogues to justify an arms regulation is on the government. *See Rahimi*, 144 S. Ct. at 1897 ("[W]hen the Government regulates arms-bearing conduct, … it bears the burden to 'justify its regulation.'" (citation omitted)); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022) ("The government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). But much of the history relied upon by the panel was not supplied by the government in this case. And in the course of deciding more than it needed to and improperly aiding the government in meeting its burden of justification, the panel introduced egregious errors into our Second Amendment

jurisprudence: it analyzed the history at such a high level of generality that it essentially returns us to the dark old days of interest-balancing.

The first of the panel's redundant analyses relied on a tradition of detaining capital defendants before trial. To apply that tradition to Perez-Garcia and Fencl, the panel transformed this tradition into one of detaining anyone charged with a "serious crime" through the assumption that at the Founding "most serious crimes were capital." *United States v. Perez-Garcia*, 96 F.4th 1166, 1182 (9th Cir. 2024). But the history shows that the Founders generally limited capital punishment to violent crimes (like murder) or crimes against the United States (like treason). Even if most serious crimes *were* capital (they weren't), a tradition associated with *most* serious crimes cannot automatically be imported to *all* serious crimes—particularly since the Founders left many serious crimes punishable only by fines or imprisonment. And even if the tradition associated with capital crimes could be wholesale attributed to "serious crimes," the panel never offers a coherent theory for what today constitutes an analogous "serious crime" for these purposes, leaving us in a position where we effectively defer to legislative decisions about who can have their Second Amendment right stripped away. Taking the Founders' historical use of capital punishment and treatment of capital defendants seriously leads to the conclusion that the condition's application to Perez-Garcia and Fencl is *not* supported by that tradition.

The panel's second—and wholly superfluous—analysis looked at the tradition of disarming "dangerous" individuals. Again, the panel gratuitously supplied much of its own historical support, essentially assuming for itself the government's burden of justification. That alone was error.

*See Bruen*, 597 U.S. at 19 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."); *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023) ("A district court should not try to help the government carry its burden by sifting historical materials to find an analogue." (cleaned up)).

But even considering the historical tradition as a whole—including information never provided by the government—the panel further erred in characterizing that history as "support[ing] the view that the Second Amendment … empowers Congress to authorize the disarming of individuals who are not law-abiding, responsible citizens." *Perez-Garcia*, 96 F.4th at 1187. The Supreme Court has since expressly rejected the "responsible" rationale. *Rahimi*, 144 S. Ct. at 1903. And the tradition of disarmament was far more targeted than merely "not law-abiding." The group disarmament laws relied on by the panel—targeting groups like Catholics and Loyalists—always focused on one particular type of perceived danger: that the group would take up arms against the government during war or in revolt. Meanwhile, the panel's historical affray and surety laws targeted those that "pose[d] a clear threat of physical violence to another." *Id.* at 1901. In both cases, the danger addressed was of a violent attack. Since the government has not shown that either Perez-Garcia or Fencl would engage in such conduct, the panel erred in its conclusion that Perez-Garcia and Fencl are "dangerous" within the meaning of our historical tradition of regulating firearms. The panel's broad characterization of the tradition effectively defers to legislative interest-balancing, putting the Second Amendment right back into legislators' hands—precisely what the Supreme Court has

made clear we cannot do. *See Bruen*, 597 U.S. at 19, 22, 26 (rejecting interest-balancing).

The panel opinion is therefore rife with methodological errors—all of which were unnecessary to deciding the case. While mootness has deprived our court as a whole of the ability to fix the panel's merits analysis, we still retained authority to take this erroneously and unnecessarily decided case en banc "for the purpose of vacating [the] decision." *United States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010). Given the panel's overreach, supplementation of the government's historical justification, and egregious jurisprudential errors, we should have exercised our discretion to do just that. Had the panel *upheld* a party's Second Amendment rights in a case with a similar posture and with an opinion likewise so abstracted from our history, no doubt every single one of my concurring colleagues would have clamored to vacate such an opinion. I thus respectfully dissent from the denial of rehearing en banc.

## II.

Jesus Perez-Garcia is a former security guard who was licensed to carry a gun in California and was required to carry a gun while working. Perez-Garcia also prefers to keep a gun with him at home because he lives in a high-crime area and wants to protect his family while his father is out working night shifts.

In June 2022, Perez-Garcia was a passenger in his friend's car as the two returned from a trip to Mexico. After drugs were found in the bumper of the car, Perez-Garcia was charged with knowingly importing a controlled substance pursuant to 21 U.S.C. §§ 952, 960. Perez Garcia denied knowing that there were drugs in the vehicle, and Perez-Garcia's friend took sole responsibility for the incident,

stating that Perez-Garcia "did not know there were drugs inside the vehicle when they crossed into the United States."

Following Perez-Garcia's indictment, a Magistrate Judge ordered that, under Standard Condition #4, a condition of pretrial release authorized under The Bail Reform Act (the Act), 18 U.S.C. § 3141 *et seq.*, of his pretrial release, Perez-Garcia could "not possess a firearm, destructive device, or other dangerous weapon" while he awaited trial (the firearm condition). Because the firearm condition barred Perez-Garcia from possessing a gun, he was forced to give up his job as a security guard and take a different job that pays him significantly less.

John Fencl is a mobile truck repairman and collector of guns. Fencl has lived in El Cajon, California for the last 13 years. As part of his job, Fencl frequently travels to distant rural areas, carrying a gun with him for safety and peace-of-mind. Fencl has a Utah concealed-carry license, but not a California one. After being arrested in September 2019 for possessing a concealed gun in California without a license, Fencl pleaded guilty to carrying a firearm without a permit, resulting in a misdemeanor conviction.

In June 2021, police entered Fencl's home, searching the premises and seizing 110 guns. The government does not dispute that almost all these guns were legally owned. But the officers also discovered three unlicensed short-barrel rifles and four unlicensed suppressors. Fencl was later indicted under federal law for the possession of these unregistered firearms and suppressors. He was granted pretrial release with the same firearm condition as Perez-Garcia, with the additional requirement that he could not possess "gun parts."

After the Supreme Court released its decision in *Bruen*, both Perez-Garcia and Fencl challenged the constitutionality of the firearm condition as applied to them. The magistrate judges in both cases rejected the challenges, and the defendants subsequently sought review in the district courts.

In Perez-Garcia's case, the district court reasoned that the firearm condition was acceptable because the condition was presumptively lawful and was analogous to historical surety statutes regarding potential affrayers—a class Perez-Garcia would be comparable to as an accused drug trafficker who, in the district court's view, was likely to pose future danger. In Fencl's case, the district court reasoned that analogues to historical traditions regarding surety statutes and pretrial detention, coupled with the view that the Second Amendment only protects law-abiding citizens and that the condition was "tailored" to Fencl's circumstances, meant that it was acceptable under the Second Amendment. Perez-Garcia and Fencl appealed, and their appeals were consolidated. *United States v. Garcia*, Nos. 22-60314, 22-50316, 2023 WL 2596689 (9th Cir. Jan. 26, 2023).

In January 2023, our court issued a short order summarily affirming the district court's reasoning. *Id.* Fourteen months later in March 2024, the panel explained its reasoning in a follow-on opinion. *Perez-Garcia*, 96 F.4th at 1174–92.

Between the issuance of the order and the panel opinion, the defendants "moved to dismiss their appeals as moot after [our court] ruled against them but before [the panel] provided [its] reasoning" because "Fencl was convicted at trial and Perez-Garcia's bond was revoked for repeatedly failing to appear for hearings." *Id.* at 1172. Therefore, the defendants argued that the panel "lack[ed] jurisdiction to

explain [its] dispositive order because their challenges to their pretrial release conditions [were] moot." *Id.* The panel rejected this request, determining instead that when "mootness arises after a 'valid decision' has already been rendered," federal courts may still issue an opinion if "equitable and pragmatic considerations" demand that they do so. *Id.* at 1173 (internal citations omitted). The panel reasoned that its opinion was justified because (1) the issue becoming moot after a decision did not preclude it from explaining why it ruled the way it did, (2) it was "merely explain[ing] the basis for [its] decision and [did] not take further action on the merits of Appellants' claims," (3) "equity" demanded that it issue an opinion "since Appellants are challenging the common, statutorily authorized practice of imposing firearm restrictions as a condition of pretrial release," and (4) "dismissal would not be pragmatic because it would likely force later panels to duplicate [its] efforts while confronting the exact same issues." *Id.* at 1173–74.

On the merits, the panel determined that the firearm condition's application to the defendants did not violate their Second Amendment rights. In analyzing this issue, the panel explained that "the Bail Reform Act's firearm condition, as applied to Fencl and Perez-Garcia," aligns with historical firearm regulations imposed on those charged with "serious charges" and, "more generally, those who are not law-abiding, responsible citizens." *Id.* at 1181.

To support its determination, the panel first considered our historical tradition of detaining capital defendants before trial. *Id.* at 1182. The panel reasoned that since "most serious crimes were eligible for capital charges," "the government … usually … detain[ed] … defendants indicted on capital charges." *Id.* "[O]nce detained, criminal

defendants were completely disarmed," allowing those charged with serious crimes to be disarmed pretrial consistent with that tradition. *Id.* The panel rejected the contention that the government was required to "identify a historical regulation under which Perez-Garcia and Fencl, specifically, would have been disarmed pending pretrial release in the 18th century." *Id.* at 1185. Instead, the panel concluded that because the defendants faced felony charges, they "undoubtedly were charged with serious crimes" such that they would have been subject to pretrial detention—and therefore disarmament—at the Founding. *Id.* at 1184–85. The panel thus determined that the tradition of pretrial detention for capital defendants alone sufficiently justified the application of the firearm condition to Perez-Garcia and Fencl.

Having already unnecessarily provided one rationale for its long-moot summary order, the panel nonetheless went on to conduct a second—and thus doubly unnecessary—historical analysis. The panel considered the tradition of disarming "dangerous" individuals and determined there was "a lengthy and extensive Anglo-American tradition of disarming individuals who are not law-abiding, responsible citizens." *Id.* at 1186. In support of this conclusion, the panel cited a history that included the English Bill of Rights, the colonial disarmament of Catholics and Loyalists, affray laws, surety laws, and pre-ratification proposals for the Second Amendment. *Id.* at 1186–89. Many of these historical sources were never provided by the government in its briefing in this case. The panel reasoned that because the firearm condition (1) was imposed to disarm those deemed a threat to public safety, (2) "does not broadly prevent law-abiding citizens … from exercising their right to keep and bear arms," and (3) was individually tailored in its

application to Perez-Garcia and Fencl, its application to them was consistent with the tradition of disarming "dangerous" individuals. *Id.* at 1189–91.

The panel therefore concluded—on two separate bases—that the "firearm condition on pretrial release is constitutional as applied to Fencl and Perez-Garcia." *Id.* at 1191. The defendants filed a joint petition for vacatur, rehearing, or rehearing en banc, requesting that the panel opinion in their moot cases be vacated.

## III.

In assessing pretrial-release conditions, we review factual findings for clear error, "[b]ut the conclusions based on such factual findings present a mixed question of fact and law and require the exercise of sound judgment as to the values underlying the legal principles." *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). Therefore, "we make an independent examination of the record to determine whether the … order is consistent with the defendant's constitutional … rights and arrive at our conclusion *de novo*." *Id.*

## IV.

The panel's opinion contains profound substantive errors that will potentially reach well beyond just the pretrial disarmament question that was presented in this case. But that's not the only reason we should have vacated the opinion en banc. What makes the panel's opinion particularly troubling is that it went out of its way to decide an unnecessary issue with potentially broad implications *in a moot case*. The panel needlessly analyzed our tradition of disarming "dangerous" individuals shortly before *Rahimi* was poised to do the same. The Supreme Court has since

decided *Rahimi*, analyzing a similar history, and leaving litigants and lower courts to wonder how much of the panel opinion's dangerousness analysis survives *Rahimi*. In performing this gratuitous analysis, the panel improperly helped the government meet its burden of justification by supplementing the historical record. *See Rahimi*, 144 S. Ct. at 1897 (reemphasizing the government "bears the burden to 'justify its regulation'" of arms) (citation omitted)); *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation."). On top of all that, the panel erred in its analysis.

We should have taken this case en banc for the limited purpose of vacating the panel's opinion. Doing so would have been appropriate to wipe the slate clean for another case—one in which the government, not the panel, carried the government's burden—to resolve the historical analogy analysis and determine how *Rahimi* affects our existing caselaw. By electing not to do so, the panel's opinion injects many substantive errors into our jurisprudence.

A.

The Supreme Court in *Bruen* gave us the standard we are required to follow in Second Amendment challenges. We initially ask, as a "threshold inquiry," *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023), whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If so, "the Constitution presumptively protects that conduct." *Id.* The government can then justify the regulation only "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* This is what the Court meant when it said *Heller* demanded "a test rooted in the Second Amendment's

text, as informed by history." *Id.* at 19.  We first consider the plain meaning of the Second Amendment's text, and if that plain meaning covers any given conduct, we perform a historical analysis to inform whether a specific regulation is nonetheless "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

Like the panel, I have no difficulty concluding that Perez-Garcia and Fencl are part of "the people" within the scope of the Second Amendment's plain text. *Perez-Garcia*, 96 F.4th at 1181.  But the panel erred on multiple levels in its historical analysis, both in its method and its conclusions. The panel's historical methodology essentially returns our court back to pre-*Bruen* interest-balancing, and in doing so ignores the guiding principles *Bruen* gave us for our historical analysis.  This is one reason we should have taken this case en banc to vacate the panel's wholly unnecessary and expansively erroneous opinion.

1.

The first consideration in any Second Amendment inquiry after *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct."  597 U.S. at 17, 24.  This is a purely textual question, taking the Second Amendment at its word: "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

Thankfully, the Supreme Court has already spoken to the plain facial meaning of the text.  The reference to arms "extends, prima facie, to *all instruments* that constitute bearable arms."  *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (emphasis added); *see also* Jamie G. McWilliam, *The Relevance of "In Common Use" After Bruen*, 37 Harv. J.L. & Pub. Pol'y Per Curiam 1, 7 (2023) (concluding that the Second Amendment should initially be

applied "according to its plain text, as *Bruen* demanded, with 'arms' meaning any bearable weapon"). The Supreme Court has similarly concluded that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons,'" and of "bear Arms" is to carry those weapons. *Heller*, 554 U.S. at 582, 584. Perez-Garcia wanted to carry a gun so that he could protect his family and pursue employment as a security officer. Fencl wanted to carry a gun to protect his home and for self-defense while travelling for work. This clearly falls within the Supreme Court's reading of the plain text of "to keep and bear Arms."

In analyzing the scope of "the people," the Court has noted that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. The Court therefore concluded that there is "a strong presumption that the Second Amendment right … belongs to *all Americans*." *Id.* at 581 (emphasis added). Despite this "strong presumption," some courts have nonetheless determined that there is some subset of Americans not included within "the people." *See, e.g.*, *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (interpreting *Heller* as "limiting the right to 'law-abiding and qualified individuals'"). But the *Heller* Court's description of the presumption was unqualified: "the Second Amendment right … belongs to all Americans." 554 U.S. at 581. And the Court reiterated in *Bruen* that the "Second Amendment [right] [is] guaranteed to 'all Americans.'" 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581).

Reading "the people" to include all Americans as a matter of plain text does not foreclose that there may also be limitations on who can exercise their Second Amendment rights. The first textual step of *Bruen* does not resolve this

Second Amendment question—it merely creates a presumption of constitutional protection. And the Court in *Heller* read the plain text to *presumptively* apply to "all Americans." 554 U.S. at 581. I therefore read the Second Amendment as presumptively protecting Perez-Garcia and Fencl. It is then up to the government to carry its burden that there is some tradition of regulation that would exclude them from exercising their Second Amendment rights in this context. *See Rahimi*, 144 S. Ct. at 1897 ("[W]hen the Government regulates arms-bearing conduct … it bears the burden to 'justify its regulation.'" (citation omitted)).

2.

"[T]he appropriate analysis [in a Second Amendment challenge] involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. In meeting its "burden to 'justify its regulation,'" *id.* at 1897, the government only needs to "identify a well-established and representative historical *analogue*, not a historical *twin*," *Bruen*, 597 U.S. at 30. Nonetheless, the Court has also chastised that "courts should not uphold every modern law that remotely resembles a historical analogue because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* (cleaned up); *see also Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring) ("To be sure, a court must be careful not to read a principle at such a high level of generality that it waters down the right."). To determine whether a historical regulation is properly analogous, we must compare the "how and why" of the regulation's burden on the Second Amendment right. *Bruen*, 597 U.S. at 29. In other words, we must ask "whether modern and historical regulations impose a comparable burden … and whether that burden is comparably justified." *Id.*

a.

The government first offered the panel a historical tradition of denying bail to capital defendants. The Northwest Ordinance, originally passed by the Congress of the Confederation and reaffirmed by the first Congress, declared that "[a]ll persons shall be bailable, unless for capital offenses." Northwest Ordinance of 1787, 18 Stat. 13, 15; Northwest Ordinance of 1789, 1 Stat. 50, 51. Similarly, the first Congress, in the Judiciary Act of 1789, provided that a defendant accused of a federal crime could generally be "arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sep. 24, 1789, ch. XX, § 33, 1 Stat. 73, 91. That Act made bail available "except where the punishment may be death, in which cases it shall not be admitted but by [a court or judge], who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

The colonies, and subsequently the states, took a similar approach around the time of the Founding. For example, in 1641 the Massachusetts Colony created an unequivocal right to bail, except in capital cases. Massachusetts Body of Liberties, art. 18 (1641) ("No mans person shall be restrained or imprisoned by any Authority what so ever, before the law hath sentenced him thereto, [i]f he can put in sufficient securitie, bayle, or mainprise, for his appearance, and good behaviour in the meane time, unlesse it be in Crimes Capitall …."). Pennsylvania adopted a similar provision in its 1682 constitution: "all Prisoners shall be Bailable by Sufficient Sureties, unless for capital Offenses …." June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 531 (1983). Following independence, "the Pennsylvania provision

became the model for almost every state constitution adopted after 1776." *Id.* at 532.

So there was a tradition of denying bail to capital defendants around the time of the Founding. And since these defendants were jailed pretrial, they were necessarily disarmed pretrial. But at this point, one might wonder what a tradition of denying bail to *capital* defendants has to do with a defendant who allegedly possessed several unregistered weapons, or one who allegedly smuggled illegal pharmaceutical substances. This is where the panel performs a magic trick. After establishing a tradition of denying bail to capital defendants, the panel waves its hand and transforms that tradition into one of denying bail to defendants charged with "serious crimes." The panel accomplishes this sleight of hand through the assumption that, at the Founding, "most serious crimes were eligible for capital charges." *Perez-Garcia*, 94 F.4th at 1182.

But the history does not bear this assumption out. For example, the very year after the Judiciary Act denied bail to capital defendants, the first Congress defined over twenty crimes in The Crimes Act of 1790, only seven of which were punishable by death. Act of Apr. 30, 1790, ch. IX, §§ 1–28, 1 Stat. 112, 112–18. Non-capital, yet serious, crimes included manslaughter, misprision of treason, mayhem (the intentional maiming of another person), and larceny. *Id.* §§ 2, 7, 13, 16. For each of these, the term of imprisonment ranged from three to seven years. *Id.* Similarly, when Massachusetts established the right to bail for non-capital offenses in 1641, it excluded a number of serious crimes from capital punishment, including burglary, robbery, and larceny. Carbone, *supra*, at 530. And in 1682, Pennsylvania "limited imposition of the death penalty to willful murder." *Id.* at 531 (cleaned up).

Shortly after the Founding, a movement began that eventually narrowed the list of capital crimes to "murder alone, or murder and rape in some states." *Id.* at 535. Indeed, "[b]y 1798, five states had abolished it for all crimes besides murder." Mugambi Jouet, *Death Penalty Abolitionism from the Enlightenment to Modernity*, 71 Am. J. Comp. L. 46, 69 (2023). And by the time of the enactment of the Fourteenth Amendment, which incorporated the Second Amendment against the states, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), many states had limited capital punishment to only the most severe crimes, or abolished it entirely.[1] In 1846, Michigan passed a law abolishing the death penalty even for first degree murder. Mich. Rev. Stat. tit. XXX, ch. 153, § 1 (1846). Rhode Island and Wisconsin followed this example in 1852 and 1853,

---

[1] There is some scholarly debate over whether the Second Amendment, when applied against the states through the Fourteenth Amendment, should be interpreted as of 1791 or 1868. *Compare* Mark Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 31 Harv. J.L. & Pub. Pol'y Per Curiam 1, 4 (2022) (arguing that the Second Amendment means what it meant when it was originally adopted) *with* Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Indiana L.J. 1439, 1441 (2022) ("When the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."). Although the Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," it did not decisively resolve this issue in *Bruen* because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." 597 U.S. at 37–38. As discussed herein, "most serious crimes" were not capital crimes around the Founding or at the time of the adoption of the Fourteenth Amendment. It is therefore unnecessary to resolve this issue in this case either.

respectively. John D. Bessler, *The Death Penalty in Decline: From Colonial America to the Present*, 50 Crim. L. Bull. 245, 258 (2014). Therefore, even assuming there is a tradition of denying bail to capital defendants, the historical evidence belies the panel's necessary link in its analysis that "most serious crimes were eligible for capital charges." *Perez-Garcia*, 96 F.4th at 1182.

In fact, as the history sketched above illustrates, there was a strong tradition in early American history of constricting the use of the death penalty from the level used in England at the time. Prior to the Founding, England made over 150 acts punishable by death. Bessler, *supra*, at 245. But Founders like James Madison and DeWitt Clinton favored abandoning capital punishment altogether, while others like Thomas Jefferson and Benjamin Franklin favored doing so for all crimes other than murder. Jouet, *supra*, at 68. Once the colonies were free, they moved swiftly to limit the number of crimes eligible for capital punishment. *See* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468 (2009) ("Within two decades of gaining independence from England, the states of the Union had replaced execution with incarceration as the punishment for all but a few crimes."). So even if the American story began with "most serious crimes" being capital, the Founders purposefully engaged in a tradition of limiting the use of capital punishment except in the most severe instances.

Even if *most* serious crimes were capital, that does not mean a tradition associated with capital crimes could be automatically imported to *all* serious crimes—particularly when the Founders specifically chose to make certain serious crimes non-capital. In *Bruen*, to elucidate what was too dissimilar to constitute a valid historical analogue, the

Supreme Court examined the tradition of prohibiting weapons in sensitive places. 597 U.S. at 30–31. The Court first evaluated historical laws banning weapons in places like "legislative assemblies, polling places, and courthouses." *Id.* at 30 (citing David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 229–36, 244–47 (2018)). The Court explained that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited … [it was] also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* It therefore concluded that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

The Court then turned to the respondents' attempted characterization of New York's proper-cause licensing requirement as a "sensitive places" law. *Id.* In essence, the respondents in *Bruen* broadly described sensitive places as those "where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* at 30–31. The Court reasoned that while people often congregate in sensitive places and law enforcement professionals are presumptively available in those locations, applying the tradition associated with sensitive places to all locations that fit those two characteristics expanded it "far too broadly." *Id.* at 31. Such a reading would "in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* The Court therefore concluded that "there is no historical basis for New York to effectively declare the island of Manhattan a

'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.*

Similar reasoning suggests that a tradition associated with capital crimes cannot be expanded to all serious crimes. Even though *Bruen* recognized that legislatures historically had the power to define certain "sensitive places," their mere ability to do so was not enough to let courts now say *anywhere* is analogous to traditionally sensitive places. Doing so would allow a specific tradition to swallow the general scope of the Second Amendment right.  The same issue arises by importing a tradition associated with *capital* crimes to all *non*-capital serious crimes: it would in effect expand the tradition so that Congress could disarm *anyone* based entirely on how it characterizes their alleged crime. Just as New York City as a whole was too broad to be analogous enough to sensitive places laws so that New York could disarm all people within the city, the scope of "serious crimes" is likewise too broad to be analogous to the specific crimes the Founders made punishable by death, and therefore eligible for pretrial disarmament.

Indeed, the Supreme Court's rejection in *Bruen* of attempts to broadly analogize to historical "sensitive places" would seem to apply a fortiori to attempts to analogize to disarmament associated with capital crimes.  For more than a half-century, the Supreme Court has acknowledged what common sense supports: "that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (opinion of Stewart, J.) (discussing *Furman v. Georgia*, 408 U.S. 238 (1972)).  You would think that more than mere ipse dixit would be required before relying on historical pretrial disarmament associated with capital

crimes as a justification for pretrial disarmament of those charged with non-capital crimes.

Finally, even if the tradition of disarming capital defendants pretrial could be applied to all defendants charged with serious crimes, the panel has not identified a coherent theory for what constitutes a "serious crime" within the meaning of this tradition. Consider a few hypotheticals: Al Capone, who was charged with tax evasion. A pimp, who runs an illegal prostitution ring. A husband, who physically maims his wife. Are these "serious crimes?" Nothing in the panel's opinion helps. The last one, the most violent example, was explicitly left non-capital by the Founders. Act of Apr. 30, 1790, *supra*, ch. IX, § 13.

In some places, the panel appears to suggest that serious crimes are those categorized as felonies. *See Perez-Garcia*, 96 F.4th at 1184 ("[D]efendants in the founding era who faced serious charges were not released because those indicted on capital charges were not offered bail, and most felonies were capital offenses."). In characterizing Perez-Garcia and Fencl's crimes as "serious crimes," the panel relied heavily on the "felony" label applied to those crimes. *Id.* at 1185. But the Supreme Court in *Bruen* rejected such judicial deference to legislative interest-balancing in the Second Amendment context. 597 U.S. at 26. If the label a legislature gives a certain crime is dispositive to whether a defendant can be disarmed, then we are again merely deferring to legislative interest-balancing, with just one additional step of requiring the legislature to label or categorize the crime.

That approach once again makes the Second Amendment a constitutional outlier. Consider how we view other constitutional rights. For example, the Supreme Court

has held that an exception to the Fourth Amendment's warrant requirement exists during "exigent circumstances." *Birchfield v. North Dakota*, 579 U.S. 438, 456 (2016). Lawmakers are not free to decide which situations are "exigent" and which are not merely by labeling them. Instead, courts look to the facts of the circumstance itself to judicially determine whether "an emergency leaves police insufficient time to seek a warrant"—such as when "there is a need to provide urgent aid to those inside [a private residence], when police are in hot pursuit of a fleeing suspect, [or] when police fear the imminent destruction of evidence." *Id.*

Similarly, the Supreme Court has stated that "fighting words" may be proscribed within the bounds of the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573–74 (1942). Again, lawmakers cannot simply label whatever speech they disapprove of as "fighting words" and thereby legislate around First Amendment protections. The Supreme Court instead looks to the substance of the words themselves, asking whether they are of a type that "when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

Courts do not generally defer to legislative label-making when constitutional rights are at stake. Instead, they look to the specifics of the case to judicially determine whether it satisfies the substance of the standard that is applied. This is true in the First and Fourth Amendment contexts, and there is no reason to treat the Second Amendment differently. To the contrary, the Supreme Court has instructed us to *stop* deferring to legislative interest-balancing in Second Amendment cases. *See Bruen*, 597 U.S.

at 19, 22, 26 (rejecting reliance on interest-balancing). Instead, the Supreme Court has given us the standard for considering whether the substance of a defendant's conduct renders him able to be disarmed under this nation's history and tradition: whether there is a tradition of disarming analogous groups in a similar manner and for similar reasons. *Rahimi*, 144 S. Ct. at 1898; *Bruen*, 597 U.S. at 29. Deference to legislative labels is not part of that test.

The tradition presented by the government and accepted by the panel is one of disarming capital defendants pretrial. As discussed above, after the Founding, states typically reserved capital punishment for severely violent crimes such as murder or rape. Carbone, *supra,* at 535. And though the federal government made certain crimes capital that we likely would not today—like counterfeiting, Act of Apr. 30, 1790, *supra*, ch. IX, § 14—most capital crimes were either violent or crimes against the United States. The "how" of burdening defendants' Second Amendment rights was therefore through a temporary but complete pretrial dispossession of the arms of a targeted group made up of those charged with discrete capital crimes.

Regarding the "why" of detaining capital defendants— and therefore disarming them—there is some scholarly dispute. Some suggest that their exclusion from bail "was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018). One contemporary source explained that bail was not universally allowed so that "the safety of the people should be preserved against the lawless depredations of atrocious offenders." A. Highmore, A Digest of the Doctrine of Bail: In Civil and Criminal Cases vii (1783). But what appears to be a broader view on the primary justification for denying bail is that capital crimes "involved a greater temptation to flee."

Lawrence H. Tribe, *An Ounce of Detention: Preventative Justice in the World of John Mitchell*, 56 Virg. L. Rev. 371, 401 (1970). As Highmore further explained in 1783, "no bail can be a security equivalent to the actual custody of the person" charged with a capital offense. Highmore, *supra*, at 172. Blackstone similarly explained the denial of bail to capital defendants by pointing to the increased temptation to flee: "For what is there that a man may not be induced to forfeit, to save his own life?" 4 William Blackstone, Commentaries \*294.

Turning now to the application of the Act's firearm condition to Perez-Garcia and Fencl, the tradition of pretrial detention for capital defendants fails to provide a "relevantly similar" analogue. *Bruen*, 597 U.S. at 29–30. First, the "how" of the burden on the Second Amendment right is sufficiently dissimilar from the proffered historical tradition that the tradition cannot save the application of the firearm condition to Perez-Garcia or Fencl. At the Founding, the peoples' Second Amendment rights were burdened by the condition that, if one was alleged to have committed a capital crime, he could be temporarily disarmed before trial.

The Act's firearm condition, particularly as applied to Perez-Garcia and Fencl, is much broader. Neither of them is alleged to have committed a capital crime. Nor are their crimes analogous to Founding-era capital crimes. Again, at the Founding, essentially all federal capital crimes were either violent or crimes against the United States. Act of Apr. 30, 1790, *supra*, ch. IX, §§ 1, 3, 8–10. And shortly after the Founding, most states limited the death penalty to only the most severe crimes such as murder. Tress, *supra*, at 468.

In comparison, Perez-Garcia was charged with two counts of importing controlled substances. This crime is not

immediately violent, nor is it a crime against the United States like treason or counterfeiting. Allowing Perez-Garcia to be disarmed through a sloppy comparison of his crime to historical capital crimes would essentially open the door to disarming *any* defendant who has been charged with *any* crime. *See Rahimi*, 144. S. Ct. at 1926 (Barrett, J., concurring) ("[A] court must be careful not to read a principle at such a high level of generality that it waters down the right."). Again, this opens wide the back door to legislative interest-balancing, since a legislature could easily legislate around the Second Amendment simply by creating new crimes (solemnly labeled "serious," of course) that would per se allow those charged with them to be disarmed—regardless of their similarity to the actual Founding-era capital crimes that triggered disarmament.

Further, the Court in *Bruen* explained it is relevant if the Founders were aware of the same societal problem yet addressed it through different means. 597 U.S. at 26–27. Although addictive substances were known and used in the years surrounding the Founding,[2] "there was virtually no effective regulation of narcotics in the United States" until the twentieth century. David T. Courtwright, *A Century of American Narcotic Policy* 1 (Institute of Medicine, 1992).

---

[2] Alcohol and tobacco were widely used and abused. *See* John C. McWilliams, *Drug Use in American History*, 6 OAH Magazine of History 3, 3 (1991) (calling tobacco at the Founding "America's favorite and most addictive drug"). Opium was also available and used by the Founders. *See* Erick Trickey, *Inside the Story of America's 19th-Century Opiate Addiction*, Smithsonian Magazine (Jan. 4, 2018), https://www.smithsonianmag.com/history/inside-story-americas-19th-century-opiate-addiction-180967673/ (describing the status of opium during the Revolutionary War and its use by Founders such as Benjamin Franklin and Alexander Hamilton).

Perez-Garcia's conduct was not criminal at all at the Founding, much less punishable by death. While we need not identify a "historical twin" to justify this regulation, the fact that the Founders were aware of the same issues surrounding Perez-Garcia's conduct that exist today but did not disarm those engaged in such conduct is strong evidence that the Act's firearm condition is unconstitutional as applied to Perez-Garcia.

Similar issues arise in applying the condition to Fencl. He was charged with possessing three unlicensed short-barrel rifles and four unlicensed suppressors. Beyond simply characterizing both as "serious," the panel never explained how mere possession of unlawful firearms is at all similar to the capital crimes meriting disarmament at the Founding era. There is little to compare the two except the fact that both the Founding-era capital crimes and the possession of the unregistered arms *are* crimes. The Founders were aware of issues surrounding armed violence, but typically resolved these problems through regulations on the manner of carrying, rather than simple possession. As two scholars recently concluded, "[f]rom 1607 through 1899, American bans on possession or sale to adults of particular arms were uncommon." David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 369 (2024). Our tradition of not criminalizing the mere possession of certain arms is strong evidence that the tradition of disarming those charged with *capital* crimes cannot be applied to those charged with mere possession of unregistered firearms.

Ultimately, disarming Perez-Garcia and Fencl before their trials is a much broader burden on their Second Amendment rights than can be supported by the narrow tradition of imprisoning (and thus disarming) those charged

with capital crimes. Under that historical tradition, the people's rights were burdened by a condition that they could be temporarily disarmed if they were charged with a capital crime. The firearm condition, as applied to Perez-Garcia and Fencl, essentially acts as a condition that they could be disarmed if charged with *any* crime where a judge finds the condition necessary. This extreme broadening of the scope of disarmament has no historical support, and therefore the "how" of the disarmament is dissimilar to the tradition of disarming capital defendants.

Second, the "why" of the burden on Perez-Garcia and Fencl's Second Amendment rights is not analogous. The Act allows imposing the "least restrictive … condition" determined to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The facial justification for allowing the imposition of release conditions generally therefore includes both securing appearance at trial and the safety of the community. But the justification for the firearm condition specifically can only be the latter. After all, while some conditions would reasonably ensure the defendant doesn't flee—like requiring supervision, reporting to law enforcement on a regular basis, or returning to custody for specified hours, *id.* §§ 3142(c)(1)(B)(i), (vi), (xiii)—others are clearly designed to ensure the community is safe. The firearm condition falls in the latter category only, as disarming a defendant limits his ability to commit a violent crime but does nothing to stop him from going into hiding. There is historical evidence going both ways on the traditional reason for disarming certain criminals before trial. But the broader view appears to be the primary justification was to ensure that the defendant wouldn't flee. Since this cannot be the

justification for the Act's firearm condition, the "why" of the restriction is not analogous to the tradition of disarming capital defendants before trial.

In sum, there are a number of issues with the panel's first historical analysis that warrant vacating the opinion en banc. The panel accepted a tradition of disarming capital defendants before trial. But the panel erred in concluding that at the Founding most serious crimes were capital. Even if most were, a tradition associated with *most* serious crimes cannot automatically be imported to *all* serious crimes— particularly when the Founders didn't do so. And even if the tradition associated with capital crimes could be wholesale attributed to "serious crimes," the panel never offers a coherent theory for what constitutes a "serious crime" for these purposes. A better historical analysis, comparing the "how" and "why" of the firearm condition's burden on the Second Amendment right to that of the proffered tradition, suggests that the condition's application to Perez-Garcia and Fencl is not supported by this nation's historical tradition of firearms regulation, and is therefore unconstitutional as-applied. Letting the opinion stand, insulated from review on the merits by mootness, returns us by a different route back to the pre-*Bruen* days of deferring to legislative interest-balancing.

b.

After concluding that the firearm condition's application to Perez-Garcia and Fencl was constitutional as analogous to the tradition of disarming capital defendants before trial, the panel conducted an alternative historical analysis grounded in "our nation's history of barring people or groups deemed dangerous or unlikely to respect the sovereign's authority from possessing firearms." *Perez-Garcia*, 96 F.4th at 1186.

Before even considering the substance of that history, there are a number of threshold problems with the panel's analysis. First, it was entirely unnecessary. The panel could have rested its decision on the first tradition it considered, but instead went out of its way to analyze a secondary issue that could be more broadly relevant to other Second Amendment issues. And in doing so, the panel foraged broadly, going well beyond what the government provided it in this case, and then misapplied the history it collected on its own to return us to the old regime of deference to legislative interest-balancing. All of this was done in a case that had already become moot—thereby insulating the merits of the opinion from further appellate review and, if necessary, correction.

Before turning to the panel's errors, it is helpful to first outline the history on which the panel purports to rely. Namely, "our nation's history of barring people or groups deemed dangerous or unlikely to respect the sovereign's authority from possessing firearms." *Id.* There are two tracks of historical laws that make up this tradition: those that targeted "dangerous" groups, and those aimed at "dangerous" individuals. Many of the specific laws forming this tradition were not supplied by the government in its briefing, and the panel's sua sponte creation of a historical record on behalf of the government was improper. *See Bruen*, 597 U.S. at 19 ("[T]he government must affirmatively prove its firearms regulation is part of the historical tradition."); *Rahimi*, 144 S. Ct. at 1897 (emphasizing "the Government … bears the burden to 'justify its regulation'" of the Second Amendment right (citation omitted)). But because the panel relied on unbriefed historical laws, I must do so as well to show how

the panel misapplied and misanalysed the historical record
of its own creation.

i.

First, there are historical laws disarming those who, as a
group, were feared to be opposed to the ruling regime and
therefore prone to take up arms against it.   Such laws
originate from pre-colonial England, where they often
targeted "those involved in or sympathetic to rebellions and
insurrections."    Joseph G.S. Greenlee, *The Historical
Justification for Prohibiting Dangerous Persons from
Possessing Arms*, 20 Wyo. L. Rev. 249, 258 (2020).   For
example, in 1400, a Welsh rebellion sought to remove Wales
from English rule.    Hefin Rees, *Awakening the Welsh
Dragon: Will the Creation of the National Assembly for
Wales Make a Significant Difference to the Constitutional
Arrangements Between England and Wales?*, 23 Suffolk
Transnat'l L. Rev. 459, 461 (2000).     The Glyndwr
Rebellion—named for its leader Owain Glyndwr, *id.*—
lasted fifteen years, and resulted in a general disarmament of
Welshmen.  2 The Statutes at Large, from the Fifteenth Year
of King Edward III to the Thirteenth Year of King Hen. IV
413–14 (Danby Pickering ed. 1762) ("[T]hat none of the said
*Welshmen* from henceforth bear any manner of armour
within such city, borough, or merchant town ....").

During the following century, England disarmed
Catholics because they were considered "potentially disloyal
and seditious" to the Protestant Crown.     Greenlee,
*Possessing Arms*, *supra*, at 258 (citation and internal
quotation marks omitted).     This general disarmament
continued until an exception was added in 1689 "'for the
defence of his House or person' with permission from the
justice of the peace." *Id.* at 258–59 (quoting 1 W. & M., ch.

15 (1688)).   The seventeenth century in England saw a number of rules aimed at disarming "disaffected persons" surrounding the Glorious Revolution—first those thought disloyal to King James II, and then those "perceived as posing a threat to King William III and Queen Mary II" after the revolution.  *Id.* at 259.  Indeed, it was the disarmament of Protestants by King James II—"at the same time when Papists were … armed"—that ultimately led to the English Bill of Rights' protection of "Protestants … hav[ing] arms for their defence" under King William III and Queen Mary II.  1 W. & M., ch. 1, § 6, ch. 2, §7, in 2 History of the English Parliament 561–62 (1892).

The general tradition of disarming those "who might want to overthrow" the current government was carried over into the colonies.  *Id.*  Specifically, during the French and Indian War, there was fear that Catholic colonists would sympathize with the Catholic nation of France.  *See* Jamie G. McWilliam, *Refining the Dangerousness Standard in Felon Disarmament*, 108 Minn. L. Rev. Headnotes 315, 319 (2024).  As one scholar described the situation: "American Protestants worried that their Catholic neighbors were plotting with Catholic France to impose Catholic rule throughout America."  Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 35–36 (2024).  And as exemplified by one pseudonymous author in the *Pennsylvania Gazette* in 1754, some feared "having our Children enslaved by the Church of Rome," by those "inhuman Butchers," the Catholics.  Philanthropos, Pa. Gazette, Sept. 5, 1754, No. 1341.

Consistent with this sentiment, Maryland enacted a law in 1756 that "all such Armour, Gunpowder, and Ammunition, of whatsoever Kinds, as any Papist … hath …

in his House … or elsewhere … shall be taken from such Papist" and imprisoned those who failed to comply.  Act of May 22, 1756, in Votes and Proceedings of the Lower House Assembly of the Province of Maryland 95 (1757).  In that same year, Virginia likewise enacted a law that "no Papist or reputed Papist … shall or may have or keep … any arms, weapons, gunpowder, or ammunition."  Act of 1756, in 3 Ecclesiastical Statutes at Large 510 (James Thomas Law ed. 1847).  Pennsylvania followed suit with a law substantially similar to Maryland's.  3 Pennsylvania Archives 131–32 (Samuel Hazard ed. 1853).

Many colonies also enacted firearm laws targeting American Indians based on the history of warfare between the Indians and European settlers.  In 1619, Virginia made it a crime to "sell or give any Indians any piece shott, or poulder, or any other armes offensive or defensive."  1 Journals of the House of Burgesses of Virginia 13 (H.R. McIlwaine ed. 1915).  Massachusetts similarly banned selling or bartering "any gun or guns, powder, bullets, shot, lead, to any Indian whatsoever."  Act of 1633, in The Charters and General Laws of the Colony and Province of Massachusetts Bay 133 (1814).  In 1639, the Dutch colony of New Netherlands forbade its residents "to sell any Guns, Powder or Lead to the Indians."  Ordinance of March 31, 1639, in Laws and Ordinances of New Netherland, 1638–1674 19 (E.B. O'Callaghan ed. 1868).  Other colonies followed suit, with at least Connecticut, Pennsylvania, and Maryland eventually barring the trade of guns with the American Indians.[3]  These laws were part of a

---

[3] *See* The Public Records of the Colony of Connecticut, Prior to the Union With New Haven Colony, May 1665 529–30 (J. Hammond

comprehensive scheme aimed at defending the fledgling colonies from violent encounters with their Indian neighbors. *See* Greenlee, *Disarming the Dangerous*, *supra*, at 29.

Like attacks from neighboring Indians, many in the colonies had an "equivalent fear" of an armed uprising by slaves and free Blacks against the slave-holding regime. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 L. & Hist. Rev. 567, 581 (1998). In response, many colonies prohibited slaves or even free Blacks from possessing arms. McWilliam, *Refining the Dangerousness Standard*, *supra*, at 319–20. In 1639, Virginia provided that all persons were to be armed "except negroes." Act of January 6, 1639, in 1 The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619 226 (William Waller Hening ed. 1809). And New York, in 1664, made it unlawful "for any Slave or Slaves to have or use any gun Pistoll sword Club or any other Kind of Weapon whatsoever" unless in the presence of their master. Act of 1664, in 2 The Colonial Laws of New York From the Year 1664 to the Revolution 687 (James B. Lyon ed. 1894). During the eighteenth century, at least Delaware, New York, Maryland, South Carolina, and Georgia similarly regulated

---

Trumbull ed. 1850) (barring repairing an Indian's gun or selling one to an Indian); Act of October 22, 1763, in 6 The Statutes at Large of Pennsylvania 320 (banning giving, selling, bartering, or exchanging with any Indian "any guns, gunpowder, shot, bullets, lead or other warlike stores without license"); 1757–68 Md. Acts 53 (prohibiting selling or giving "Gun-powder, Shot, or Lead" to Indians over a certain quantity and frequency).

the possession of weapons by "any Negro or Mulatto slave."**4**

The colonists continued this tradition of disarming those who might essentially be enemy combatants during the Revolutionary War by disarming those who remained loyal to Great Britain. Loyalists posed a serious threat to the revolutionary cause. As one British historian noted, "we may safely say that 50,000 soldiers, either regular or militia, were drawn into the service of Great Britian from her American sympathizers." H.E. Egerton, The Causes and Character of the American Revolution 178 (1923). Many at the time believed that "loyalists—even those simply providing supplies to the British—[could be treated] as redcoats themselves." Greenlee, *Disarming the Dangerous*, *supra*, at 52–53. As John Adams wrote in a letter to George Washington, "[Loyalists] are guilty of the very invasion in Boston, as they are constantly aiding, abetting, comforting, and assisting the army there." Letter from John Adams to Gen. Washington (Jan. 8, 1776), in 4 American Archives ser. 4 604 (Peter Force ed. 1843). And other Founders wrote that

---

[4] 1 *Laws of the State of Delaware* 104 (1797); *see also* Act of September 29, 1704, in Proceedings and Acts of the General Assembly of Maryland 261 (William Hande Browne ed. 1906) ("[T]hat no Negro or other Slave within this Province shall be permitted to carry any Gunn …."); Acts of Assembly, Passed in the Province of New York, From 1691, to 1718 144 (1719) ("[I]t shall not be Lawful for any Negro, Indian, or Mulatto Slave, to have or use any Gun or Pistol, but in his Master's … Presence …."); Act of 1740, in 7 The Statutes at Large of South Carolina 404 (David J. McCord ed. 1840) ("[I]t shall not be lawful for any slave … to carry or make use of fire arms … unless such negro or slave shall have a … license … from his master …."); Act of 1755, in 18 The Colonial Records of the State of Georgia 117–18 (Chandler ed. 1910) ("[I]t shall not be Lawfull for any Slave … to Carry and make use of Fire Arms" except with a ticket that must be renewed each month).

"if America falls, it will be owing to such divisions [between Loyalists and patriots] more than the force of our enemies." Letter from Comm. of Secret Correspondence to Silas Deane (Oct. 1, 1776), in 2 American Archives ser. 5 821 (Peter Force ed. 1851).

Beginning in New York—"a hotbed of loyalism throughout the war"—states began to disarm Loyalists. Greenlee, *Disarming the Dangerous*, *supra*, at 53. In 1775, New York's Provincial Congress cited "the immutable laws of self-defence" as justification for disarming anyone found guilty of aiding the British military. 3 American Archives ser. 4 573 (Peter Force ed. 1840). Massachusetts, in 1776, disarmed anyone who "fled to the British fleet or army" or aided such fleet or army, or refused to sign a declaration supporting the revolutionary cause. Act of May 1, 1776, in 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479–80, 483–84 (1886) (cleaned up). The next year, Pennsylvania similarly disarmed "every person … refusing or neglecting to take and subscribe [an] oath or affirmation" supporting American independence. Act of June 13, 1777, in 9 The Statutes at Large of Pennsylvania from 1682 to 1801 111–13 (1903). And New Jersey disarmed any person deemed "disaffected." Act of 1777, in Acts of the General Assembly of the State of New Jersey 90 (1777). These laws are representative of a larger trend of disarming those who might take up weapons with, or otherwise aid, the enemy British combatants.[5]

---

[5] *See, e.g.*, Act of 1775, in 15 The Public Records of the Colony of Connecticut, From May, 1775, to June 1776 193 (Hoadly ed. 1890); Act of 1776, in 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (Bartlett ed. 1862); Order of 1776, in

After the colonies gained their independence, certain arms restrictions became unnecessary—like those on Catholics, as the colonies were now allied with Catholic France.  But other groups were still perceived as dangerous to the fledgling nation.  Most notable among these were "slaves and freedmen."  Greenlee, *Possessing Arms*, *supra*, at 269.  Given the continued prevalence of slaveholding until the Civil War, the specter of an armed slave revolt remained following independence.  Indian attacks also remained common, particularly on the Western frontiers.  Many states therefore maintained arms restrictions on slaves, Indians, and other groups.

Following the Revolutionary War and into the antebellum period, a number of states continued to regulate the ability of slaves and free Blacks to possess weapons. Alabama law, for example, stated that "[n]o slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever."  Act of March 6, 1805, in A Digest of the Laws of the State of Alabama 540 (C.C. Clay ed. 1843).  Louisiana forbade any "slave [from] carry[ing] any visible or hidden arms, not even with … permission for doing so."  Act of June 7, 1806, in 1 A New Digest of the Statute Laws of the State of Louisiana 50 (Bullard & Curry ed. 1842).  Maryland made it unlawful "for any negro or mulatto within this state to keep any … gun, except he be a free negro or mulatto."  Act of 1806, in 1 The General Public Statutory Law and Public Local Law of the State of Maryland, From the Year 1692 to 1839 Inclusive 542–43 (Clement Dorsey ed. 1840).  And

---

15 Documents Relating to the Colonial History of the State of New York 103 (Fernow ed. 1887); Act of 1777, in 24 The State Records of North Carolina 89 (Clark ed. 1905); Act of 1778, in 203 Hanson's Laws of Maryland 1763–1784 193, 278 (1901).

during the Civil War, Delaware prohibited "free negroes and free mulattoes" from owning or possessing "a gun, pistol, sword or any warlike instrument." Act of March 18, 1863, in 12 Laws of the State of Delaware 332 (James Kirk ed. 1861).

Ongoing regulation of arms trading with Indians similarly persisted following independence. In 1796, the fourth Congress made it unlawful for any person to "purchase, or receive of any Indian, in the way of trade or barter, a gun." Act of May 19, 1796, ch. XXX, § 9. The Illinois Territory enacted a substantially similar law in 1813. Act of Dec. 8, 1813, in Laws and Joint Resolution Passed by the Legislative Council and House of Representatives of Illinois Territory at Their Second Session Held at Kaskaskia in 1813 14 (1920). In 1827, the Florida Territory made it lawful for any person "to cause the gun of [an Indian found outside a reservation] (if he has one) to be taken from him." Act of 1827, in Laws of the Colonial and State Governments, Relating to Indians and Indian Affairs, from 1633 to 1831, Inclusive 247 (1832). And the state of Missouri forbade any person to "sell, exchange or give, to any Indian, any … gun." Act of February 27, 1845, in The Revised Statutes of the State of Missouri 577 (1845).

The history therefore reveals that, from pre-colonial England through the antebellum period, there was a tradition of disarming groups deemed to be "dangerous." *See Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting). But the danger involved in their disarmament was always a very particular one: a violent attack against the

community by a group opposed to the current regime.  One scholar has summarized the danger posed by these groups:

> Catholics might have raised arms alongside the French against Protestant England.  The Loyalists may have attacked their fellow colonists during the Revolutionary War. Slaves and Indians may have inflicted violence on the white settlers as revenge for their enslavement or for occupying their land. In each historical scenario, danger meant one thing: a violent attack.

McWilliam, *Refining the Dangerousness Standard*, *supra*, at 324–25.  In each situation, the group had the potential to act as enemy combatants and as such was feared to take up arms and cause violence against the broader community.

ii.

As the Supreme Court recently noted, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 144 S. Ct. at 1896.  Unlike the tradition described above, which disarmed individuals because of their membership in a group that might take up arms against the United States, this other tradition addressed specific actions taken by the individual that were either violent in themselves or gave others reason to fear violence.  *See id.* at 1899–1901 ("From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others.").  These regulations typically took one of two forms: "affray" or "surety" laws.

One widespread measure—affray laws—targeted those who would carry arms to the terror of the public. These laws have their root in the English Statute of Northampton, which was passed in 1328 and prohibited "bringing … force in affray of the peace." 2 Edw. 3 c. 3 (1328). Affray was originally understood as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects." 4 Blackstone, Commentaries *145. But as applied to weapons, an affray was typically "understood … to encompass the offense of arming oneself to the Terror of the People." *Rahimi*, 144 S. Ct. at 1901 (cleaned up). Since affrays "le[d] almost necessarily to actual violen[c]e," *State v. Huntly*, 25 N.C. 418, 422 (1843) (per curiam), they were punished with "forfeiture of the arms … and imprisonment," 4 Blackstone, Commentaries *149.

This English tradition carried on across the Atlantic. The colony of New Hampshire allowed "all affrayers … or any other who shall go armed offensively, or put his Majesty's subjects in fear" to be arrested and his arms forfeited. Acts and Laws of His Majesty's Province of New Hampshire, in New England 1–2 (1761). Massachusetts punished those "as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." Act of January 29, 1795, in 1 The General Laws of Massachusetts, From the Adoption of the Constitution, to February, 1822 454 (Theron Metcalf ed. 1823). Maine enacted a similar law, targeting "all affrayers … and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State." Act of March 15, 1821, in 1 Laws of the State of Maine 353–54 (1821).

Surety laws were similar to affray laws (and indeed were often combined with them). But instead of responding to past offensive uses of a weapon, they were prophylactic

measures aimed at "*preventing* the commission of crimes and misdemeanors." 4 Blackstone, Commentaries *251. These laws consisted "in obliging those persons whom there is a probable ground to suspect of future misbehavior, to stipulate with and to give full assurance … that such offense … shall not happen, by finding pledges or securities for … their good behavior." *Id.* In other words, individuals suspected of future misconduct could be required to post bond, and if the individual then violated the terms of the surety, the bond would be forfeit. *Id.* at *253.

While surety laws in the English and colonial tradition were used to combat a range of misconduct, a relevant application in early America was to the misuse of firearms. Massachusetts's 1795 affray law, described above, was backed by the requirement that "the offender … find sureties for his keeping the peace, and being of the good behavior." Act of January 29, 1795, 1 The General Laws of Massachusetts, *supra*, at 454. In 1846, Michigan passed a law requiring surety for "any person [who] shall go armed with a … pistol … on complaint of any person having reasonable cause to fear an injury or breach of the peace." Act of May 18, 1846, in The Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846, 692 (1846). Oregon passed a substantially similar law in 1853. The Statutes of Oregon, Enacted and Continued in Force by the Legislative Assembly, at the Session Commencing 5th December, 1853 220 (1854). Several other jurisdictions enacted similar laws. *See Bruen*, 597 U.S. at 56, n.23 (listing other jurisdictions that adopted variations of "breach the peace" firearm laws).

Like the laws described above that targeted groups perceived as dangerous, the danger targeted by affray and surety laws was that "of physical violence." *Rahimi*, 144 S.

Ct. at 1901. The primary difference is that the group disarmament laws sought to preempt violence committed at the group level, while affray and surety laws targeted violence committed by discrete individuals.

iii.

The panel examined this history of disarming "people or groups deemed dangerous" and extracted the highly generalized principle that those "who are not law-abiding, responsible citizens" can be disarmed. *Perez-Garcia*, 96 F.4th at 1186. Such a reading stretches the history too far. Each of the historical laws outlined above was focused on one thing: violence. Groups like Catholics, Indians, and slaves were disarmed because of fears that they would engage in a violent attack against the community. Affray and surety laws targeted those who either carried arms offensively or who "pose[d] a clear threat of physical violence to another." *Rahimi*, 144 S. Ct. at 1901. To categorize these laws as disarming those who are not "law-abiding" is massively overinclusive—committing violence against others or the community itself is obviously *one way* to violate the law, but there is also a host of nonviolent ways to break the law. And there were many nonviolent lawbreakers at the Founding who were not disarmed. Instead, disarmament was limited to certain groups, namely, "persons guilty of committing violent crimes, persons expected to take up arms against the government, [and] persons with violent tendencies." Greenlee, *Possessing Arms*, *supra*, at 285.

Nor is "responsibility" the benchmark for valid disarmament. Since the panel issued its decision, the Supreme Court has clarified that "responsibility" is not "a line derive[d] from our case law." *Rahimi*, 144 S. Ct. at

1903.  Instead, the Court explained that it "used the term 'responsible' [in *Heller* and *Bruen*] to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right."  *Id.*   "But those discussions … said nothing about the status of citizens who were not 'responsible.'"  *Id.*  This explanation by the Supreme Court highlights why it was imprudent for the panel to conduct its second historical analysis—when it didn't have to in order to decide the moot case before it—right before *Rahimi* was decided.

The panel's pivot from "dangerous" to "not law-abiding [or] responsible" illustrates why it is important to have a historically grounded definition of "dangerousness."  *See* F. Lee Francis, *Defining Dangerousness: When Disarmament is Appropriate*, 56 Tex. Tech L. Rev. 593, 596–97 (2024).  Reading the history at such a high level of abstraction "waters down the [Second Amendment] right" so far that basically any group or individual characteristic could be linked to an ethereal "danger."  *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring).   Under the panel's conception, danger essentially becomes whatever lawmakers say it is— but there is a reason the Supreme Court rejected our previous attempts to defer to legislative interest-balancing when an important enumerated right is at stake.  *See Bruen*, 597 U.S. at 26 (warning that interest-balancing is inappropriate when constitutional rights are at stake); *Heller*, 554 U.S. at 634 (cautioning that a "constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all").  "Instead of a substantive right guaranteed to every individual *against* Congress, we would have a right controlled *by* Congress."   *Rahimi*, 144 S. Ct. at 1946 (Thomas, J., dissenting).   This would "open the door to egregious abuse" of the Second Amendment right.

McWilliam, *Refining the Dangerousness Standard*, *supra*, at 325. The Court has never countenanced such deference, and we should reject attempts in our circuit to sneak it back in.

Contrary to the panel's conclusion, the principles that underlay our tradition of disarming dangerous individuals are not "relevantly similar" to the firearm condition as applied to Perez-Garcia and Fencl. *Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898. In making this determination, we must consider "[w]hy and how the regulation burdens the [Second Amendment] right." *Rahimi*, 144 S. Ct. at 1898. It is the latter that is fatal here.

The historical laws described above present two ways that one could traditionally be disarmed. First, the group disarmament laws surrounding the Founding permitted disarmament if one was a member of a group that was expected to take up arms against the government. Second, the affray and surety laws allowed one to be disarmed if he "misus[ed] weapons to harm or menace others." *Id.* at 1899. The "principles that underpin [this specific] regulatory tradition," then, are that one can be disarmed if he misuses his weapon to harm others or takes up that weapon against his country. *Id.* at 1898. This tracks the Supreme Court's recent conclusion that the surety and affray laws support a principle that "individuals who threaten physical harm to others" can be disarmed, *id.* at 1896, and is therefore the "right level of generality," *id.* at 1926 (Barrett, J., concurring).

Neither Perez-Garcia nor Fencl falls into either category. No one has argued that they are a part of a group feared to take up arms against the United States government. While the panel cited to laws related to group disarmament, *Perez-Garcia*, 96 F.4th at 1187, its ultimate conclusion was based

on the individual danger posed by the defendants. And neither defendant "likely would threaten or had threatened another with a weapon." *Rahimi*, 144 S. Ct. at 1902.**[6]**

Perez-Garcia was charged with knowingly importing a controlled substance under 21 U.S.C. §§ 952, 960. There is no evidence in the record that Perez-Garcia carried a weapon offensively or "pose[d] a clear threat of physical violence to another." Indeed, nothing indicates that Perez-Garcia—a former security guard who had already undergone a rigorous background check to obtain a California concealed carry permit—was or would be violent. The only connection the panel is able to make between Perez-Garcia and actual danger is a statistical one. *Perez-Garcia*, 96 F.4th at 1190. But in a world where we laudably no longer view individuals as dangerous simply because they are Black, Indian, or Catholic, we should be wary of extrapolating danger and denying constitutional rights based on mere group statistics.

Fencl's alleged conduct involves firearms but similarly stops short of presenting a "clear threat of physical violence to another." *Rahimi*, 144 S. Ct. at 1901. He was charged with unlawfully possessing three unlicensed short-barrel rifles and four unlicensed silencers in violation of 26 U.S.C. § 5861(d). At no point does the record indicate that Fencl "had threatened another with" those or any other weapons. *Id.* at 1902. The panel makes much of the "more than 100 firearms in his house" and "thousands of rounds of ammunition" of various kinds. *Perez-Garcia*, 96 F.4th at 1190. But the mere possession of weapons and

---

[6] After *Rahimi*, it is clear that the government bears the burden of making this showing. 144 S. Ct. at 1897 ("[W]hen the Government regulates arms-bearing conduct … it bears the burden to 'justify its regulation.'" (citation omitted)).

ammunition—even a lot of both—does not imply that one is likely to use them against another person. Otherwise, millions of people who own multiple guns in this country—and no doubt thousands of gun owners with "large" gun collections—would categorically become "dangerous" and therefore disarmable.

In reviewing burdens on the Second Amendment right, our job is to "consider[] whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. In the context of these laws, the principle is clear: those who "pose[] a clear threat of violence to another" or to the community can be disarmed. *Id.* at 1901. The government has failed to show that Perez-Garcia or Fencl pose such a "clear threat."

This conclusion makes sense as a matter of first principles. The general principle behind the Second Amendment is that of defense against violence. *See* Jamie G. McWilliam, *A Classical Legal Interpretation of the Second Amendment*, 28 Tex. Rev. L. & Pol. 125, 150–58 (2024). It furthered this principle, in part, by securing the right of the people to possess arms for individual and collective self-defense. *See Heller*, 554 U.S. at 599, 630 (describing "individual self-defense" as "the core lawful purpose" for possessing arms and the "*central component* of the right itself"); *United States v. Miller*, 307 U.S. 174, 178 (1939) (declining to find short-barrel shotguns within the scope of the Second Amendment because they could not "contribute to the common defense"). Consistent with this general principle, those who create the danger that the Second Amendment was designed to protect against could be disarmed. This explains why those who would endanger the community by taking up arms against the government, or those who would threaten others with firearms, could

traditionally be disarmed. Since the government has not shown that Perez-Garcia or Fencl would do either, they do not fall within "the *principles* that underpin our … tradition" of disarmament. *Rahimi*, 144 S. Ct. at 1898 (emphasis added).

* * *

We should have taken this case en banc in order to vacate the panel's unnecessary and gratuitous opinion. Even though mootness deprived us of the ability to review the merits of the panel's decision, there was still "the opportunity to seek an en banc rehearing for the purpose of vacating [the] decision." *Payton*, 593 F.3d at 886. "The decision whether to vacate a filed opinion based on post hoc mootness is within our discretion based on equity." *Dickens v. Ryan*, 744 F.3d 1147, 1148 (9th Cir. 2014) (en banc) (cleaned up). It is appropriate to exercise that discretion to "clear[] the path for future relitigation of the issues between the parties," *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), or where "exceptional circumstances … counsel in favor of such a course," *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994).

The facts surrounding the panel's opinion rendered the circumstances exceptional enough to warrant vacating it. The panel went out of its way to needlessly analyze the history of disarming "dangerous" individuals—an issue key to the constitutionality of a host of gun laws, including most of the section 922(g) rules. *Perez-Garcia*, 96 F.4th at 1186. It did not have to do so. The panel's conclusion that the tradition of detaining capital defendants before trial justified the firearm condition's application to Perez-Garcia and Fencl, although erroneous, was sufficient to decide the case. *Id.*

Vacating this opinion wouldn't just "clear[] the path for future relitigation of the issues between the parties." *Munsingwear*, 340 U.S. at 40. It would also clear the path for the dangerousness issue to be cleanly litigated by a host of other parties in non-moot cases that actually turn on dangerousness. Those cases would likely involve comprehensive briefing of the history. Here, notwithstanding its burden of producing historical analogues that justify its regulation, *Rahimi*, 144 S. Ct. at 1897; *Bruen*, 597 U.S. at 24, the government's briefing contained only a portion of the history relied upon by the panel. For example, there was no discussion of laws disarming Catholics, the English Bill of Rights, or the many eighteenth-century justice-of-the-peace manuals listed by the panel. As these laws were not included in the government's briefing, the defendants had no chance to respond to them. The answer to the dangerousness inquiry would therefore be more fairly and comprehensively adjudicated in a future case in which dangerousness was a central issue.

The concurral attempts to justify the panel's assistance with the government's burden by characterizing the issue as a "question of law" that the panel had to get right. No doubt it is the court's duty to get the law right, which raises a very interesting theoretical tension between the court's role in interpreting legal questions and the government's burden to identify historical analogues. That could present a difficult challenge in a *different* case where the panel had no choice but to balance those concerns to properly decide the case. But here, the case was moot, and the panel could easily have exercised its discretion not to issue an opinion—especially since it obviously thought the government had done an inadequate job of presenting the historical record. Or it could have at least limited its opinion to just one of its

alternative grounds.  But since none of these issues *needed* to be addressed in an opinion at all, it rings hollow for the concurral to suggest that the panel was forced to do its own research to help the government meet its burden to develop the historical record in order to get the law right … in a moot case.  It's beyond dispute that the panel here went out of its way to decide issues it clearly did not need to decide, and then helped the government in deciding those issues.

Against this background of unnecessarily deciding the dangerousness issue and doing so using historical analogues not provided by the government, the errors in the panel's own merits analysis become all the more problematic.  As discussed above, the panel's historical analysis flies in the face of Supreme Court precedent twice over: It abstracts the history to such a high level of generality that it essentially returns us to the realm of interest-balancing, *Bruen*, 597 U.S. at 26, all while failing to hold the government to its burden, *Rahimi*, 144 S. Ct. at 1897.  Even if those errors alone would not necessarily warrant vacating the panel's opinion, introducing these errors through a needless analysis in which the panel helped the government meet its burden of justification certainly presents an exceptional circumstance in which it would have been appropriate to exercise our equitable discretion to vacate the panel's opinion.  *U.S. Bancorp Mortg. Co.*, 513 U.S. at 29.  "Although we can no longer use en banc review to correct the errors in the opinion because the case became moot … we can vacate the decision to avoid having the panel's serious misinterpretations of Supreme Court [Second Amendment] jurisprudence become the law of our circuit."  *Parsons v. Ryan*, 784 F.3d 571, 572 n.1 (9th Cir. 2015) (Ikuta, J., dissenting).  We should have done so here.